**FINGERHUT PRODUCTS COMPANY, et al., Relators,**

v.

**COMMISSIONER OF REVENUE, Respondent.**

No. 46906.

Supreme Court of Minnesota.

Sept. 23, 1977.

Faegre & Benson and Erwin N. Goldstein, Minneapolis, for relators.

Warren Spannaus, Atty. Gen., C. H. Luther, Deputy Atty. Gen., Dept. of Revenue, St. Paul, for respondent.

Heard before SHERAN, C. J., and MacLAUGHLIN and SCOTT, JJ., and reconsidered and decided by the court en banc.

SHERAN, Chief Justice.

The commissioner of revenue determined that the taxpayers were liable for addition-al use taxes assessed against the value of various mailing lists used by them in their mail order business. Taxpayers appealed this determination to the tax court, which affirmed. Upon certiorari to this court to review the decision of the tax court, we affirm in part and reverse in part.

On December 23, 1971, the commissioner of revenue filed four orders assessing additional sales and use taxes for the taxable period of August 1, 1967, to June 30, 1968. The four corporations which were affected by these orders were all part of the Fingerhut group of companies.[1] Appeals were thereafter taken to the tax court, where all but one of the contested issues were resolved under two joint stipulations. The sole remaining issue concerns the taxability under Minn.St. 297A.14 of various mailing lists that during the taxable period were used by the Fingerhut Manufacturing Company and the Fingerhut Products Company.[2] For simplicity, both of these taxpayers will hereafter be referred to as "Fingerhut."

Fingerhut is a Minneapolis-based direct mail merchandiser of a wide range of consumer products. Most of the items sold by Fingerhut are intended for use in the home, and include such articles as luggage, power tools, dishes, cookware, and automobile seat covers. During the taxable period, Fingerhut both solicited its customers and sold its products exclusively by mail. The typical mailing sent to a prospective customer contained an advertisement listing a single product for sale, an offer for extended payment terms, a product trial period, and merchandise premiums for placing an order and trying the advertised product. Approximately 98 percent of these mailings were sent to specific persons living outside Minnesota. All of this material was sent through the United States mail. It was estimated by one of Fingerhut's executives that close to 190 million separate mailings

1. In addition to the two companies involved in the present case, the commissioner's orders affected Wiman Manufacturing Company and Mastercraft Engineering Company.

2. Subsequent to the assessment but prior to trial, Fingerhut Manufacturing Company was merged into the Fingerhut Corporation. The title of the present case was therefore amended to reflect this change in corporate identity.

were made during the taxable period and that about 2.4 percent of these mailings resulted in sales of merchandise.

To enhance the success of its mailing operation, Fingerhut attempts to solicit business only from selected individuals. Thus, roughly one-half of the sales literature is sent to persons who have previously purchased items by mail from Fingerhut. The remainder of the names and addresses are obtained from mailing lists that are rented from mailing-list brokers. These lists reflect a broad spectrum of demographic data related to buying patterns, such as a person's average income, family size, geographical location, and previous history of buying products through the mail. The actual names and addresses supplied by the broker are intended for one-time use only and during the taxable period came in the form of Cheshire tapes, gummed labels, heat transfers, and typed mailing lists. For this service Fingerhut paid a rental fee of $17.50 to $25 per thousand names. The aggregate amount expended by Fingerhut for mailing lists during the taxable period was $1,396,702.10.

Fingerhut filed timely sales and use tax returns for the taxable period, but it did not report in those returns the amounts expended for the Cheshire tapes, gummed labels, heat transfers, or typed mailing lists. Subsequently, the commissioner levied a deficiency assessment of $41,901.06 plus interest, representing 3 percent of the amount expended by Fingerhut for these lists during the taxable period.[3]

On appeal to the tax court, the assessment was affirmed, on the ground that the mailing lists obtained by Fingerhut were tangible personal property subject to taxation within the contemplation of the statute. Upon the petition of Fingerhut, we granted review by certiorari. Minn.St. 271.10, subd. 1.

The parties are in agreement that the tax, if any, applicable to the procurement of these mailing lists is that provided by Minn.St. 297A.14, which imposes a use tax "[f]or the privilege of using, storing or consuming in Minnesota tangible personal property." The sole issue here is whether the mailing lists are "tangible personal property" within the meaning of the statute so that their use may be taxed.[4]

The focus of Fingerhut's argument to the tax court and on this appeal is that the mailing lists rented from its brokers were not tangible personalty subject to taxation under the statute. There is no dispute that during the taxable period the vast percentage of the names and addresses supplied came in the form of actual mailing labels. When Fingerhut contracted for Cheshire tapes, gummed labels, or heat transfers, it received names and addresses that had to be mechanically separated and placed on its mailings. Fingerhut advances the theory, however, that the essence of what it received from the brokers was not a physical list of names but rather a service which supplied highly sophisticated advertising information which was an intangible commodity.

To support this argument, Fingerhut principally relies on *Dun & Bradstreet v. City of New York*, 276 N.Y. 198, 11 N.E.2d 728 (1937), where the New York Court of Appeals considered the applicability of a local sales tax law in relationship to the rendition of professional services. The taxpayer was in the business of supplying to its subscribers highly confidential information dealing with the financial standing of persons engaged in various businesses. As an incident to this service, each subscriber received for his own personal use a reference book at no extra charge. In refusing to

---

**3.** For the taxable period in question, Minn.St. 1969, § 297A.14 imposed a use tax rate of 3 percent. The rate of taxation has since been increased to 4 percent. Ex.Sess.L. 1971, c. 31, art. 1, § 4.

**4.** Fingerhut attempts to raise on appeal certain issues which were not raised before the tax court. We have repeatedly held that we will not consider issues raised for the first time on appeal. See, *Elwell v. County of Hennepin*, 301 Minn. 63, 221 N.W.2d 538 (1974); *Rathbun v. W. T. Grant Co.* 300 Minn. 223, 219 N.W.2d 641 (1974). We decline to deviate from that rule in this case.

allow the city of New York to tax the value of this reference book, the court articulated two factors that have since been used by other courts to distinguish tangible personalty from intangibles. First, the subscriber was able to make only a limited use of the books. Under the subscription contracts, title to the books remained in the taxpayer and the subscriber was expressly forbidden to share the confidential information contained therein with the public. Second, and more important, the physical properties of the reference book were merely incidental to the services performed. As explained by the court (276 N.Y. 205, 11 N.E.2d 731):

> " * * * The information furnished is of value to the subscribers and for it they pay but not for the paper upon which the information is conveyed or for the reference books which are only guides to assist in the rendition of appellant's service. One does not think of a telephone company as a seller of books to its subscribers. It renders a service. To make that service efficient, it furnishes its subscribers with books containing a list of its subscribers with their call numbers. 'The paper is a mere incident; the skilled service is that which is required.'" (Citations omitted.)

Fingerhut maintains that its procurement and use of the mailing lists supplied by its brokers satisfy both of these criteria. As in *Dun & Bradstreet,* the use that may be made of the lists is sharply restricted. Ordinarily, the brokers permit the lists to be used only once, and Fingerhut is required to make its mailings between rigidly set dates. Moreover, the value of the tangible format containing the names and addresses, estimated at approximately 80 cents per thousand names, is slight when compared to the $17.50 to $25 price of a corresponding number of names. Many of the lists also have a limited useful life. For instance, a list that would be useful in selling seat covers to new car owners may have a useful life expectancy of only 6 months. Lastly, it would have been possible for Fingerhut to obtain the information on the mailing lists, albeit with considerable inconvenience,

without the interference of a tangible medium. The names and addresses could have been transmitted orally by telephone, or someone could have contacted the broker and manually copied the information from the broker's lists.

The commissioner advances the argument, however, that in this case the taxpayer acquired a tangible commodity, i. e. tapes, labels, etc., which were used when they were physically attached to the mailings. The fact that these labels were more valuable because of the information they contained does not, in the view of the commissioner, alter their nature as tangible personal property.

■ Subsequent to the *Dun & Bradstreet* case, a number of courts struggled to develop meaningful tests to distinguish the sale or use of intangible services from personalty. Some courts have looked to the value of the tangible format used as contrasted to the value of the item sold. For example, in *Commerce Union Bank v. Tidwell,* Tenn., 538 S.W.2d 405 (1976), the court based its finding that the sale of a computer program was not subject to sales tax in part on the fact that the value of the cards containing the program was only a small fraction of the total cost. Another approach that has been used is to assess whether or not the transaction has a temporary or transitory value. If what is sold is something like marketing or research data that has a very short useful life, there is a greater likelihood that the transaction is a nontaxable service. See, *Williams & Lee Scouting Service, Inc. v. Calvert,* 452 S.W.2d 789 (Tex. Civ.App.1970). A final consideration is whether the transaction can be achieved without the intervention of a tangible medium. Returning to the computer program example discussed in *Commerce Union Bank v. Tidwell, supra,* there can be no taxable transfer when a program is transmitted by the seller to the buyer's computer electronically, as by transmission through a telephone line. Motion pictures, on the other hand, cannot exist without the tangible celluloid medium, and therefore courts have

**610**

uniformly subjected their rental value to use tax. See, *Florida Assn. of Broadcasters v. Kirk*, 264 So.2d 437 (Fla.Dist.App.1972); *Crescent Amusement Co. v. Carson*, 187 Tenn. 112, 213 S.W.2d 27 (1948).

In our view, the question presented in the instant case is extremely close, and we do not find the resolution easy. Intangible property, such as information, may be transferred with or without the use of a tangible medium. When a tangible medium is used, it is often the case that such use is merely incidental to the substance of the transaction between the supplier and the consumer of the intangible. Yet our taxing statute makes no distinction regarding the nature of the tangible property subject to taxation; if tangible property is used or consumed, such use or consumption is taxed. Our statute does not, however, impose a tax on the use or consumption of intangible personal property. The line of demarcation between the use of intangible property and the use of its tangible manifestation is not a clear one.

■ Based upon the record before us, we conclude that the tax court erred in holding that the use by Fingerhut of the typed mailing lists constituted the taxable use of tangible property. Like the transfer of computer programs through the use of punch cards, the use of the tangible medium of typed mailing lists is merely incidental to the use of the incorporeal information contained in those lists. The typed lists themselves were not used within the contemplation of the statute; what was used was the information contained in the lists. Such use, in our opinion, is not taxable under the current statute.[5]

■ We feel that the use of the Cheshire tapes, gummed labels, and heat transfers is, however, sufficiently distinguishable from the use of the typed mailing lists to justify imposition of the use tax. In these instances there is a use of the tangible property of

the medium distinct from the use of the typed mailing lists, in that the tapes and labels are physically separated and attached to the envelopes. In such a case, the physical manifestation of the property is itself used—not merely the intangible information. This distinction is, in our opinion, sufficiently great to justify a different treatment for tax purposes of the typed mailing lists and the other rental mailing lists in the form of Cheshire tapes, gummed labels, and heat transfers.

Affirmed in part, reversed in part, and remanded.

ROGOSHESKE, J., took no part in the consideration or decision of this case.

MacLAUGHLIN, J., following oral argument, took no part in the consideration or decision of this case.

---

5. In reaching this conclusion, we are aware that other jurisdictions have imposed a tax on such lists. We do not intimate that our legislature could not, if it chose to do so, tax the use of mailing lists or similar information, no matter how transmitted. However, under the present statute, the tax is applied only to the use of tangible property, and the valid imposition of the tax is limited by that fact.