**WATLOW WINONA, INC.,**
a corporation, Relator,

v.

**COMMISSIONER OF REVENUE,**
Respondent.

No. C4–92–668.

Supreme Court of Minnesota.

Feb. 12, 1993.

Lawrence J. Hayes, Mark R. Gleeman, Maun & Simon, St. Paul, for relator.

Hubert H. Humphrey, III, Atty. Gen., Barry R. Greller, Sp. Asst. Atty. Gen., St. Paul, for respondent.

TOMLJANOVICH, Justice.

We are asked to decide whether the tax court properly concluded that Watlow Wi-nona was engaged in a unitary business with its parent company Watlow Electric and other Watlow subsidiaries, during tax years 1984 through 1987. There is substantial evidence in the record to support the tax court's determination that the businesses were unitary during the tax years in question. Under the Minnesota Income Tax Statute and the United States Constitution, the taxpayer in this case had the burden of proving that it was not unitary with its owner and its owner's other subsidiaries. It did not meet this burden. Thus we affirm.

### A. Procedural History

This case arose from an order of the Commissioner of Revenue following an audit which determined that from 1984 through 1987 Watlow Winona, Inc. ["Winona"] was operating its business inside and outside of Minnesota as part of a unitary business with its parent corporation, Watlow Electric Manufacturing Company ["Watlow"] and other subsidiaries of Watlow Electric. Having concluded that Winona was engaged in a unitary business with Watlow and Watlow's other subsidiaries, the Commissioner determined that it was required to report its net income to Minnesota using the combined income approach of Minn.Stat. § 290.34, subd. 2 (Supp. 1987).[1] Therefore, the Commissioner concluded that a part of the entire income of the unitary business should be apportioned to Minnesota, using the three factor formula of Minn.Stat. § 290.191, subd. 2 (Supp. 1987).[2]

The taxpayer brought an administrative protest. The Commissioner affirmed the original order. Winona appealed to the Minnesota Tax Court. Trial was held before the tax court and on February 4, 1992,

1. There are basically two ways to tax the income of a business group which generates income in more than one state. The first method involves computing locally taxable income on the basis of formal geographical or transactional accounting. The second type, at issue here, is the unitary business principle whereby after the finding of a unified business system, as defined by statute in any given state, a portion of the income of the unified business is attributed to the taxing state for taxation purposes. See *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 164–65, 103 S.Ct. 2933, 2940, 77 L.Ed.2d 545 (1983).

2. Prior to 1987, these two statutory provisions were codified elsewhere in Minn.Stat. ch. 290 (1986) or appeared in slightly different form. The parties have conceded that the differences are not material to the issues under review. We thus refer to the 1987 codification.

that court issued its Findings of Fact, Conclusions of Law and Order for Judgment. It held that Winona and Watlow were unitary businesses. It also held that, for the tax years in question, the portion of Winona's income attributable to Minnesota would be more accurately determined by the unitary method of reporting, rather than the separate accounting method.

The taxpayer moved the tax court for amended findings or a new trial on February 11, 1992. The tax court denied the motion. Winona appealed to this court.

## B. Facts

Except for the ultimate findings that Winona was engaged in a unitary business with Watlow and Watlow's other subsidiaries, Winona does not challenge the tax court's factual findings. Indeed, except for the ultimate findings regarding the unitary nature of the businesses, the tax court's findings are essentially the findings proposed by Winona. Thus, the issue before us today is not whether the findings are supported by the evidence, but whether the findings support the tax court's determination as to the unitary nature of the businesses. The findings are extensive; we summarize only those relevant here.

During the years at issue, 1984 through 1987, Winona was a wholly owned subsidiary of Watlow Electric Manufacturing. Watlow's headquarters are in St. Louis, Missouri. Watlow and its subsidiaries, other than Winona, manufacture heaters. In contrast, Winona manufactures and sells electronic controls. Watlow does not manufacture controls in its St. Louis headquarters. During the tax years at issue, Watlow was privately held by members of the Desloge family. The holders of the majority of the voting shares were two brothers, George Desloge and Louis Desloge, Jr.

During the years in question, Winona's line of business of electronic controls was separate and distinct from Watlow's heaters. On occasion, Winona controls might have been installed in Watlow products

such as deep fat fryers. The court found that less than 5% of Winona sales involved such products. There was significant testimony to the effect that the engineering at the Winona facility required more technical expertise than that at Watlow headquarters. The average Winona employee needed and had more education than the average employee at Watlow's headquarters. The complexity level of the engineering performed at Winona is buttressed by the fact that Winona's engineering expenses were a higher percentage of its sales than they were for Watlow and its other subsidiaries.

Watlow did not involve itself much in the day-to-day operations at Winona. It did, however, send managers there from St. Louis headquarters to oversee operations. Once a general manager was in place, he would engage in only minimal contact with Watlow's headquarters; similarly, only on rare occasions did St. Louis officials travel to Winona to view or comment on operations there.

From 1982 until the beginning of 1986, Watlow sent George Wootten to manage the Winona operations. Prior to this assignment, Wootten had been Director of Engineering at Watlow. Although Wootten was initially told that he would physically be at Winona three days per week performing his duties, this rather quickly escalated to five days per week. After this assignment started, he had no regular job duties at Watlow. Despite the increase in time spent in Winona, Wootten maintained his office in St. Louis during the period he was general manager of the Winona operations.

Wootten had significant authority to make capital improvements and purchases for Winona. Even for significant improvements, such as construction of a new building at a cost of over $3 million, Wootten was authorized to make the expenditures.[3] However the cost was borne by Watlow, not Winona.

---

**3.** This testimony is somewhat in conflict with other testimony which states that he required approval for expenditures in excess of $500,000.

During his tenure at Winona, Wootten was a member of Watlow's Executive Staff. Unlike the executive staffs of many corporations, Watlow's Executive Staff was not a decision-making group, but a reporting group. Wootten did not regularly attend Executive Staff meetings, and when he did, it was only to report on the highlights of activities at Winona. He did not ask for or obtain the Executive Staff's approval of his decisions. While at Winona, Wootten had the power to hire and fire employees, the authority to make budgets for Winona, purchase material for Winona and set prices for Winona's products.

During the tax years in question, Watlow issued internal correspondence which indicated that it hoped that Watlow and Winona could develop a group of shared customers and thus successfully integrate portions of its business. This plan did not succeed and ultimately the two shared few customers. Winona's products were, however, carried in Watlow's catalog; catalog sales accounted for about 18 to 20% of Winona's business. The remainder of Winona's business, about 80%, was generated through the sale of custom designed control products specifically manufactured to meet customers' needs. During the tax years in questions, intercompany sales between Winona and Watlow and other Watlow subsidiaries were insignificant.

During Wootten's tenure at Winona, decisions were made to change the responsibilities of the Winona facility. Wootten decided to shift some less sophisticated assemblies to another Watlow facility. Significantly, Watlow transferred over a profitable line of sensor products from Winona to another Watlow subsidiary.

Prior to or during February 1986, Wootten determined that he could not continue in his position at Winona. After leaving Winona, he returned to Watlow as a vice president. Watlow replaced him with Keith Laken. When Laken started in Winona, Louis Desloge, Jr. did not tell him how to manage, or if any changes should be made; as he had with Wootten, Desloge instructed Laken to make his own decisions. Laken did so. During 1986 and 1987, he made the daily management decisions at Winona, regarding such things as possible acquisitions by Winona, new products, organizational structure, charitable contributions, public relations and the attorneys hired by Winona. As with Wootten before him, Laken had the authority to hire and fire and make decisions regarding wage levels, working hours, inventory decisions and fringe benefits for the Winona facility. While Laken was general manager of Winona, he did not receive performance reviews. His salary was tied to Winona's return of investment.

There was a consistent flow of value between Watlow and Winona. Watlow maintained an intercompany account from which funds would on occasion be made available to a subsidiary when a cash requirement arose. This account was used to transfer funds between Watlow and Winona. Between 1984 and 1987, Winona transferred funds through the intercompany account to Watlow when funds were available from Winona's cash flow. Winona's general manager was responsible for the decision to transfer funds to Watlow. When he did so it was so Watlow could maximize the return on its investment. Thus, Winona did not technically receive loans or transfers from Watlow; instead, it received investments of capital through the intercompany account and was thus charged no interest. Similarly, Winona did not pay dividends to Watlow.

Watlow allocated certain charges, known as "headquarters charges," to its subsidiaries. These charges emanated from Watlow's 1982 reorganization by profit center. The allocations were based upon sales forecasts. The allocation method was used in part because of George Desloge's belief that if Watlow allocated the costs, the subsidiaries would have an incentive to keep them to a minimum. This system of allocation further reflected Watlow's philosophy of delegation, rather than making management decisions through more direct managerial control. On occasion, it became apparent that although a certain cost was being "charged back" to Winona, Winona was receiving no corresponding benefit. In such an instance, the policy would be

changed, and Watlow would stop charging Winona for that particular item.

After making the above findings in accord with Winona's proposed findings, the tax court judge made additional findings not proposed by Winona. He found that "[s]ufficient unity of ownership and operations exist and functional integration existed so as to constitute Watlow and Winona a unitary business for tax purposes," and "[t]he integration resulted in mutual benefits to all members of the Watlow family of corporations, which is not capable of being allocated, or recognized, by the reporting of income computed · for each individual company."

After making these factual findings, the judge made, in part, the following Conclusions of Law:

1. Reporting of Minnesota Income by Winona on a separate accounting basis does not reflect the proper apportionment of income attributable to Minnesota.

2. Winona and Watlow were unitary businesses.

3. The unitary method of reporting income more accurately determines the income of Winona attributable to Minnesota than the separate accounting method.

In reviewing the tax court's findings of fact, this court applies a narrow standard of review:

> Review of Tax Court determinations is generally limited to determining whether there is sufficient evidence to support the Tax Court's decision. Although review of questions of fact is limited, this court has plenary power with respect to questions of law.

*Nagaraja v. Commissioner of Revenue,* 352 N.W.2d 373, 376 (Minn.1984) (citations omitted). This court has acknowledged that a finding of unitariness is a mixed question of law and fact but has stressed that the determination is "basically factual." *Commissioner of Revenue v. Associated Dry Goods,* 347 N.W.2d 36, 38 (Minn. 1984).

## I.

Minnesota Statute § 290.17, subd. 4 defines a unitary business in pertinent part as follows:

(b) The term "unitary business" means business activities or operations which are of mutual benefit, dependent upon, or contributory to one another individually or as a group. The term may be applied within a single legal entity or between multiple entities and without regard to whether each entity is a corporation, a partnership or a trust.

(c) Unity is presumed whenever there is unity of ownership, operation, and use, evidenced by centralized management or executive force, centralized purchasing advertising, accounting, or other controlled interaction, **but the absence of these centralized activities will not necessarily evidence a nonunitary business.**

(d) Where a business operation conducted in Minnesota is owned by a business entity that carries on business outside the state different in kind from that conducted within this state, and the other business is conducted entirely outside the state, **it is presumed that the two business operations are unitary in nature, interrelated, connected, and interdependent unless it can be shown to the contrary.**

\* \* \* \* \* \*,

(g) Each corporation or other entity that is part of a unitary business must file combined reports as the commissioner determines. On the reports all intercompany transactions between entities \* \* \* must be eliminated and the entire net income of the unitary business determined in accordance with this subdivision is apportioned among the entities \* \* \*.

Minn.Stat. § 290.17, subd. 4 (Supp.1987) (emphasis added). Subdivision 4(d) creates a rebuttable presumption that businesses are unitary if its requirements are met. Winona has never disputed the fact that it is owned by Watlow, that Watlow carries on its business outside of Minnesota, or that Watlow's business is different in kind

from Winona's. The legislature has chosen to move the burden to the taxpayer in this class of cases; consequently, the taxpayer must prove that it is not engaged in a unitary business with the other businesses related by ownership.

In determining whether businesses are unitary and functionally integrated, it is proper to apply the "three-unities" test, derived from *Butler Bros. v. McColgan*, 315 U.S. 501, 508, 62 S.Ct. 701, 704, 86 L.Ed. 991 (1942). The three unities are (1) unity of ownership; (2) unity of operation; and (3) unity of use. *Commissioner of Revenue v. Associated Dry Goods*, 347 N.W.2d 36, 39 n. 4 (Minn.1984). United States Supreme Court case law requires that for unitary treatment there must be some sharing or exchange of value not capable of precise identification or measurement. A mere transfer of profits arising out of a passive investment or a distinct business operation is not sufficient to consider businesses unitary. *Container Corp. of Am. v. Franchise Bd.*, 463 U.S. 159, 166, 103 S.Ct. 2933, 2940, 77 L.Ed.2d 545 (1983).

*Container* is the leading case discussing the boundaries of unitary taxation. Container Corporation manufactured custom-ordered paperboard packaging. Its major activities were conducted in the United States. Container controlled 20 subsidiaries located in foreign countries. The subsidiaries were quite autonomous. Despite this degree of autonomy, the Supreme Court ruled that they were unitary. In reaching this conclusion, the Court looked at the following factors:

(1) Assistance in obtaining equipment and filling personnel needs;
(2) Loaning funds;
(3) Guaranteeing loans;
(4) Interplay in corporate expansion;
(5) Technical Assistance; and
(6) Supervisory role in providing general guidance.

*Id.* at 179, 103 S.Ct. at 2947.

Many of these same factors exist in the present case. Watlow sent managers from St. Louis to run Winona. Although Watlow did not technically loan funds to Winona, funds were available to Winona through the intercompany account when Watlow needed them; because of this method of "financing," Winona did not need to borrow funds and Watlow did not need to guarantee loans. At the very least, there was attempted interplay in corporate expansion in that Watlow set goals of further integration, such as Watlow and Winona having customers in common. Interplay may exist even when plans are not ultimately successful. It is clear that little if any technical assistance was provided to Winona by Watlow.

As to Watlow's supervisory role, Winona maintains that Watlow did not exercise enough guidance and control over Winona to justify Winona being taxed on a unitary basis with Watlow and the other Watlow subsidiaries. The Supreme Court has made it clear that the *potential* to operate a company as part of a unitary business is not dispositive on unitary taxation questions. The potential to do so must actually be exercised. *See F.W. Woolworth Co. v. Taxation & Revenue Dept.*, 458 U.S. 354, 362, 102 S.Ct. 3128, 3134, 73 L.Ed.2d 819 (1982).

It is undisputed that Watlow did not offer much guidance to Winona in a direct day-to-day fashion. We do not believe, however, that day-to-day guidance is the only method by which a parent may supervise or guide a subsidiary, thereby making their operations unitary. There is substantial evidence in this case that the Desloge brothers tended to delegate authority, rather than overseeing each and every detail of a subsidiary's affairs. Wootten and Laken were delegated significant authority, but were still accountable to headquarters: Watlow sent personnel to Winona whom it would not have to supervise because these employees were deemed trustworthy and knowledgeable enough to manage the Winona facility with little or no guidance. Both Wootten and Laken had been trained in Watlow's corporate headquarters. We believe this is actual control, even if veiled.

Thus the tax court did not err in deciding that this type of "hands-off" management

did not mean that Winona had overcome the presumption of unitariness. There is substantial evidence to support the tax court's finding that Winona did *not* demonstrate that it was *not* engaged in a unitary business with Watlow and other Watlow subsidiaries as required by the statute. The burden was placed on Winona to prove to the tax court that it was not engaged in a unitary business with Watlow and Watlow's other subsidiaries. In light of the above, there was substantial evidence to support the tax court's conclusion that Winona did not meet its burden of proof. Thus, its conclusion that Winona was engaged in a unitary business with Watlow and other Watlow subsidiaries was proper and Winona is liable for the apportioned tax.[4]

## II.

Winona also argues that the apportioned tax is unconstitutional under the Due Process Clause and the Commerce Clause of the federal constitution. The Commissioner urges us not to decide these constitutional issues, arguing that they were not raised or decided in the tax court and that Winona has improperly raised them for the first time on appeal.

This court will not normally consider issues not raised below. *Fingerhut Products Co. v. Commissioner of Revenue*, 258 N.W.2d 606, 608 n. 4. (Minn.1977). Although federal case law was cited in the briefs below, our review of the record does not indicate to us that these constitutional issues were raised in the clear and specific fashion necessary to guarantee appellate review.

Minn.R.Civ.App.P. 103.04 gives us the authority to "take any * * * action as the interest of justice may require." We will address the constitutional issues in this case, because our review of the proceedings below convinces us that Winona's arguments create the inference that it believed the unitary tax would be unconstitutional. The issue is further muddled because both the Minnesota Income Tax Code and the Federal Constitution require a finding of unitariness before a state may tax income generated outside its borders. We stress, however, that in order to insure the review of particular questions on appeal, they should be raised more clearly than they were in this case.[5]

 *Container* is the leading Supreme Court case setting forth the standards to be used when determining whether or not unitary taxation of a corporation is consti-

---

4. Winona also argues that the tax court's conclusion is wrong because of Minnesota Rule 8019.-0100, subp. 5 (1991) which states:

 A group of corporations, related through common ownership, which might otherwise be considered to be carrying on separate trades or businesses are considered engaged in a unitary trade or business when there is strong centralized management in determining the policies of each corporation respecting its primary business activities, coupled with the existence of centralized offices for such functions as financing, advertising, research or purchasing.

 * * * * * *

 A finding of strong centralized management is not supported merely by showing that the requisite ownership percentage exists or that there is incidental economic benefit accruing to a group because such ownership improves its financial position. Both elements of strong centralized management, that is, strong centralized management authority and the exercise of that authority through centralized operations, must exist in order to justify a

conclusion that the operations of otherwise seemingly separate trades or businesses are significantly integrated so as to constitute a unitary business.

A rule may not supersede a statute. Nor may statutes be amended or abridged by rule. *See Guerrero v. Wagner*, 310 Minn. 351, 357, 246 N.W.2d 838, 841 (1976). To the degree, the rule abridges the statute, it is void and the statute controls. Furthermore, even under the rule, we believe there is substantial evidence to support the conclusion that there was strong central management because some of the functions that a truly independent corporation would perform for itself were performed for Winona by Watlow. In its role as the managing corporation, Watlow provided accounting services, prepared tax returns, contracted for insurance, hired attorneys, and financed major acquisitions for Winona.

5. Winona also asks us to strike down the apportioned tax pursuant to the due process clause of the state constitution, Minn. Const. art. 1, § 2. Not so much as a case is cited for this proposition. We refuse to consider it.

tutional. Writing for the Court, Justice Brennan noted that once a state has decided to tax a corporation as a unitary business using an apportionment formula, several tests are applied to determine whether the apportionment formula is constitutional under the Due Process Clause and the Commerce Clause; generally, an apportionment formula must "be fair." 463 U.S. at 169, 103 S.Ct. at 2942 (citations omitted). The Court held that unitary taxation of businesses should only be avoided on constitutional grounds " 'if the taxpayer can prove by "clear and cogent evidence" that the income attributed to the State is in fact "out of all appropriate proportions" to the business transacted in that State * * *.' " *Id.* at 170, 103 S.Ct. at 2942. (Citations omitted) (emphasis added).

The first component of fairness—sometimes called "internal consistency"—is that "the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business's income being taxed." *Id.* at 169, 103 S.Ct. at 2942. Our review of the record discloses that Winona did not provide any evidence to the lower court to prove that this was the case: It simply alleged that it had already paid state taxes in Missouri. This is not the "clear and cogent" showing required of Winona in order for us to declare the apportioned tax unconstitutional.

The second constitutional requirement is that the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated. The Court was careful to note, however, that

> [t]he Constitution does not 'invalidate an apportionment formula whenever it *may* result in taxation of some income that did not have its source in the taxing State * * *'

*Id.* at 169–70, 103 S.Ct. at 2942, citing *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 272, 98 S.Ct. 2340, 2344, 57 L.Ed.2d 197 (1978) (emphasis in *Container* ).

**6.** Winona argues that there must be an "organic" relationship between the in-state and out-of-state corporation before out-of-state property may be taxed on a unitary basis, citing *Fargo v. Hart,* 193 U.S. 490, 24 S.Ct. 498, 48 L.Ed. 761

Again, Winona has not borne this burden of proof. There is no "clear and cogent evidence" demonstrating that it is not unitary with Watlow and the Watlow family of corporations. In order to prove constitutional invalidity under the Due Process clause, a taxpayer would have to present more comprehensive evidence demonstrating why the unitary tax is unfair than Winona presented in this case.

■ Under the Commerce Clause, a unitary tax must also not result in discrimination against interstate commerce. *Container,* 463 U.S. at 170–71, 103 S.Ct. at 2943. In *Container,* the Court noted it could have chosen to interpret the Clause to require that the apportionment formula of one state should be similar to those of other states so that a corporation would not be liable for more taxes than if its businesses were limited to one jurisdiction. The Court continued by noting that it has not adopted this approach and "has not * * * required much in addition to the requirement of fair apportionment." *Id.* at 171, 103 S.Ct. at 2943. Further, the Court has avoided making only one method of taxation constitutionally permissible. Thus, a tax will not be found in violation of the Commerce Clause simply because it differs from that used by other states as long as it meets the tests which determine whether it has been fairly apportioned. *Id.*[6]

Winona further argues that there has been a recent revolution in the law of unitary taxation and that two recent United States Supreme Court cases, *Quill Corp. v. North Dakota, ex rel. Heitkamp,* 504 U.S. ——, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992) and *Allied–Signal v. Director, Div. of Taxation,* —— U.S. ——, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992) have rewritten the law of multistate taxation. Our review of these cases indicates to us that there has been no such revolution.

(1904) and *Wallace v. Hines,* 253 U.S. 66, 40 S.Ct. 435, 64 L.Ed. 782 (1920). We believe, however, that the reasoning in these opinions has evolved into that detailed by the Court in *Container.*

*Quill Corp.* presented the Supreme Court with the question whether a state may tax a corporation *at all* whose only connection with the state is that it sells its products within the state through the mail. The Court ruled that under the Commerce Clause, the corporation could not be taxed because the state lacked the "substantial nexus" with the taxpayer required by the Commerce Clause. 504 U.S. at ——, 112 S.Ct. at 1911–13. The Court did not chart new ground. Rather it reaffirmed its earlier holding in *National Bellas Hess, Inc. v. Department of Revenue of Ill.,* 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967). Regardless, *Quill Corp.* is simply not on point: Watlow owns Winona, and Winona's principle place of business is Minnesota. Thus, Watlow cannot argue that it has no connection with Minnesota for purposes of apportioned taxes as could the taxpayer in *Quill Corp.*

Contrary to Winona's assertions, *Allied–Signal* did not alter the law of the constitutionality of apportioned taxation for interstate either. Rather, in *Allied–Signal,* the Court indeed reaffirmed the analysis it had used in cases such as *Container.* —— U.S. at ——, 112 S.Ct. at 2263. Under *Container,* the taxpayer must show by "clear and cogent" evidence that the businesses are not operationally related. Similar to our statute, the Supreme Court has placed the burden on the taxpayer to prove that the tax is unconstitutional. Winona did not satisfy this burden for purposes of the state statute. Nor has it done so for constitutional purposes.

The tax court did not err by concluding that Winona was engaged in a unitary business with its parent Watlow and Watlow's other subsidiaries. On the record before us, Winona has not proved that the apportioned tax is unconstitutional.

Affirmed.

PAGE, J., took no part in the consideration or decision of this case.