CITY OF BOULDER, a Colorado municipal corporation, Petitioner/Cross–Respondent,

v.

LEANIN' TREE, INC., a Colorado corporation, Respondent/Cross–Petitioner.

No. 01SC797.

Supreme Court of Colorado, En Banc.

June 30, 2003.

Jean E. Dubofsky, Office of the City Attorney, Joseph N. de Raismes, III, Jerry P. Gordon, Boulder, Colorado, Attorneys for Petitioner/Cross–Respondent.

Faegre & Benson, LLP, Neal S. Cohen, Eileen M. Kiernan–Johnson, Berg Hill Greenleaf & Ruscitti, David G. Hill, Boulder, Colorado, Attorneys for Respondent/Cross–Petitioner.

Justice COATS delivered the Opinion of the Court.

Boulder petitioned for review of a court of appeals' decision upholding summary judgment in favor of Leanin' Tree in its tax dispute with the city. The district court found that the right acquired by Leanin' Tree through its license agreements with independent artists, for the use of their art in manufacturing greeting cards, was an intangible right, not subject to the Boulder use tax. The court of appeals affirmed, finding that the transactions were not taxable for the separate reason that they fell within an exemption in the Boulder tax code for property actually transformed by the manufacturing process. Because we hold that the nature of the transactions by Leanin' Tree does not make them transactions for the sale or use of tangible personal property within the contemplation of the Boulder tax code, we affirm the judgment of the court of appeals on other grounds.

**I.**

In April 1997, Boulder conducted a tax audit of Leanin' Tree, a Boulder business manufacturing and selling greeting cards and other gift products, for the period of February 1, 1994 through January 31, 1997. As a result of the audit, the city issued a notice of assessment for various items. Leanin' Tree protested certain of the assessed sales and use taxes and requested a hearing with the

Boulder City Manager. Following the hearing, the city manager's office denied Leanin' Tree's protest of the use tax assessments. Leanin' Tree then filed this action in district court, and the parties filed cross-motions for summary judgment. For purposes of summary judgment, the parties entered a joint statement of undisputed facts.

The greeting cards and other gift products manufactured and sold by Leanin' Tree contain images of original artwork created by independent artists. Leanin' Tree entered into license agreements with these artists whereby it borrowed their artwork and received the exclusive right to reproduce and publish the images. To obtain the artwork, Leanin' Tree borrowed the original piece, a photographic negative of the original artwork, or a digital image on a computer disk of the original piece.

Because the original image, in most cases, was much larger than the five to seven square-inch size available on greeting cards or other products, Leanin' Tree created a color separation of the artwork, negative, or digital image, transforming the image from its original size to a product-usable size. In addition, Leanin' Tree routinely added borders or verse or both, almost always changed the contrast of the image, often changed the composition of the image by adding or deleting elements in the image, and frequently cropped the image to best fit the product. The derivative image on the color separation was then burned onto metal plates that were used along with colored inks to print the image of the artwork onto greeting cards. In every case, Leanin' Tree returned the original artwork to the artist after it created the color separation.

If Leanin' Tree manufactured and sold merchandise containing an artist's ideas, it paid the artist royalties as a percentage of the revenues received for the product. In cases where Leanin' Tree borrowed a piece of artwork and made a color separation, and then decided not to manufacture any products with the image or sell any products with

the image, Leanin' Tree owed nothing to the artist under the license agreement.

The district court entered summary judgment in favor of Leanin' Tree, holding that the right it acquired through these license agreements was an intangible right that was not subject to the use tax. In an unpublished opinion, the court of appeals affirmed on other grounds, holding that the transactions were not taxable under the manufacturer's processing exemption, which exempts from taxation tangible personal property sold at wholesale that enters into the processing and becomes an ingredient or component part of the product or service being manufactured or furnished.[1] Boulder petitioned this court for a writ of certiorari.

## II.

Boulder's tax code requires the payment of a sales or use tax on the purchase price paid or charged for tangible personal property or taxable services sold or used in the city. B.R.C. § 3–2–2(a) (1981). It defines "tangible personal property," in pertinent part, as "corporeal personal property that may be seen, weighed, measured, felt, or touched or is in any manner perceptible to the senses." B.R.C. § 3–1–1(ss). The code makes no attempt to define services [2] or personal property that is other-than-tangible.

The price of a purchase often includes a combination of tangible personal property and services or rights that are other-than-tangible. *See, e.g., Babcock v. Nudelman,* 367 Ill. 626, 12 N.E.2d 635, 637 (1937) (practice of optometry involves both providing a service and furnishing tangible property). If the price of the tangible property involved in a transaction can be meaningfully separated from the price commanded by the intangible portion of the transaction, the sales or use tax must be calculated on the purchase price of only the tangible property. *Cf. A.D. Store Company, Inc. v. Exec. Dir. of the Dept. of Rev.,* 19 P.3d 680, 684 (Colo.2001) (construing state sales tax statute with regard to the sale and alteration of clothing: "If they are sepa-

---

1. *See* B.R.C. § 3–2–6(c); *see also Bedford v. Colorado Fuel & Iron Corp.,* 102 Colo. 538, 549, 81 P.2d 752, 759 (1938).

2. It does of course enumerate the services that are taxable, none of which have the parties claimed to be applicable here.

rable, then the service is not taxable."). If, however, the various portions of the transaction are not meaningfully separable, the ordinance, like the corresponding state statute, provides no more express guidance for taxing the transaction.

Rather than imposing a sales or use tax on the full purchase price of every inseparably mixed transaction, the City Manager of Boulder has, by implementing regulation,[3] construed the ordinance to require characterization of each transaction according to its "true" or "real object."

> The test for determining whether a particular transaction involves a sale of tangible personal property or the transfer of tangible personal property incidental to the performance of a service is one of the true objects of the contract. If the true object sought by the buyer is the service per se, the transaction is not subject to tax even though some tangible personal property is transferred.... [A]n idea may be expressed in the form of tangible personal property and that property may be transferred for a consideration from one person to another; however, the person transferring the property may still be regarded as the consumer of the property. *Thus, the transfer to a publisher of an original manuscript by the author thereof for the purpose of publication is not subject to taxation.* The author is the consumer of the paper on which is recorded the text of the creation. However, the tax would apply to the sale of mere copies of an author's works or the sale of manuscripts written by other authors where the manuscript itself is of particular value as an item of tangible personal property and the purchaser's primary interest is in the physical property. Tax would also apply to the sale of artistic expressions in the form of paintings and sculptures even though the work of art may express an original idea since the purchaser desires the tangible object itself; that is, since the true object of the contract is the work of art in its physical form.

Special Industry Regulation, SR–31(2) (emphasis added).

Although not binding on courts, such interpretative regulations are entitled to deference with regard to implementation, as long as they do not misapply or misconstrue the statute or ordinance. *See Huddleston v. Bd. of Equalization,* 31 P.3d 155, 160 (Colo.2001). The regulation's mandate to tax inseparably mixed transactions only when the object of the transaction is fairly characterized as the sale or use of tangible personal property is clearly consistent with the mandate of the ordinance itself to tax only tangible personal property. It is less clear that the regulation prescribes any practical method, much less one that reflects the legislative intent embodied in the ordinance, for making that determination in individual cases.

A number of jurisdictions have similar provisions in either their statutes or regulations for determining the true character, object, or purpose of inseparably mixed transactions for purposes of their taxability. Attempts to apply these provisions in a consistent and meaningful way have led to a variety of approaches, with emphasis on a variety of different factors. *See, e.g., Emery Indust., Inc. v. Limbach,* 43 Ohio St.3d 134, 539 N.E.2d 608, 613 (1989) ("overriding purpose" test); *Hasbro Indus., Inc. v. Norberg,* 487 A.2d 124, 126 (R.I.1985) ("real object" of the transaction); *Quotron Systems, Inc. v. Comptroller of Treasury,* 287 Md. 178, 411 A.2d 439, 443 (1980) ("predominant purpose" test); *Bullock v. Statistical Tabulating Corp.,* 549 S.W.2d 166, 167 (Tex.1977) ("essence-of-the-transaction" test); *WTAR Radio–TV Corp. v. Commonwealth,* 217 Va. 877, 883, 234 S.E.2d 245, 249 (1977) ("true object" test). This court has not before expressly considered the taxability of inseparably mixed transactions.[4]

---

**3.** The city manager has the authority to adopt legislative and interpretive rules to implement the tax provisions in the code. B.R.C. § 3–2–17(a).

**4.** This court considered the taxability of somewhat similar transactions in *A.B. Hirschfeld Press, Inc. v. City and County of Denver,* 806 P.2d 917 (Colo.1991); however, that case concerned the distinction between wholesale and retail sales rather than tangible and other-than-tangible property.

### III.

The transactions for which Boulder assessed a use tax against Leanin' Tree clearly involved purchases of other-than-tangible personal property, even if they included the transfer of tangible personal property as well; and the tangible and other-than-tangible portions of the transaction were not meaningfully separable. Although Leanin' Tree used in its manufacturing process the tangible medium upon which the artists' representations appeared, the transactions never permitted Leanin' Tree to keep, sell, display, or otherwise benefit from the artwork as a finished product. Furthermore, the arrangements for compensating the artists clearly reflected a transaction other than a traditional sale of goods. The transactions normally did not involve direct payment to the artists for the use of their artwork but involved compensation in the nature of royalties for cards or products sold by Leanin' Tree. Short of simply separating the cost of raw materials, which is more appropriately taxed to the artists in the absence of contrary directions in the tax law, there is no meaningful way to separate the value of the tangible medium from the value of the right to reproduce the image appearing on it.[5] The taxability of these transactions therefore must depend upon the intent of the Boulder ordinance to treat transactions of this kind as the sale or use of tangible personal property or as something else.[6]

Faced with a virtually identical interpretative regulation (although substantially different tax provisions), California has resolved the matter by reference to the single consideration of physical usefulness. *See Preston v. State Bd. of Equalization,* 25 Cal.4th 197, 105 Cal.Rptr.2d 407, 19 P.3d 1148, 1158 (2001) ("Together, these decisions establish that any transfer of tangible property *physically useful* in the manufacturing process is subject to sales tax even though the true object of the transfer is an intangible property right like a copyright.") (emphasis in original); *see also Simplicity v. State Bd. of Equalization,* 27 Cal.3d 900, 167 Cal.Rptr. 366, 615 P.2d 555, 562 (1980) (holding that film negatives and master recordings were tangible personal property, even though they were valued in part for their intellectual content, because they were also physically useful in the manufacturing process). Boulder urges that its tax provisions be implemented similarly.

While such a standard has the clear advantages of simplicity and relative consistency of application, it does little to further an expressed legislative intent to tax only the purchase or use of tangible personal property. Rather, by postulating, in effect, that the tangible aspect of the transaction is necessarily an object of the transaction and cannot be incidental, as long as the intangible right can be acquired and used only in conjunction with or through the use of tangible property, it reduces virtually all inseparable transactions to transactions for the purchase of tangible personal property, to be taxed in their entirety.[7]

Furthermore, to the extent that reliance upon "physical usefulness" as the determining factor does not render a tax exemption for intangible rights (like copyrights) completely illusory, its desirability as tax policy, and the corresponding intent of the ordi-

---

5. This in no way suggests that the ownership of a copyright is not distinct from ownership of any material object in which the work is embodied. *See* 17 U.S.C. § 202 (2002).

6. After the district court's decision in this case, the city manager modified its interpretative regulations of the code. Because these modifications were not in effect during the relevant time periods in this case, they are not applicable and do not influence our determination of the intent of the ordinance.

7. As a practical matter, the full royalties for artwork used as book illustrations that were at issue in *Preston* were not taxed as tangible personal property because of different provisions in the California tax code. Sometime after the decision in *Simplicity,* the California code was amended to include a "technology transfer agreements" provision, more expressly treating transactions of this nature and requiring separation and taxation of a temporary transfer of tangible artwork according to the separately stated price of the parties or, in absence of a specific designation, either the price at which the tangible personal property was sold, leased, or offered to third parties, or 200 percent of the cost of materials and labor used to produce the tangible personal property subject to tax. *See Preston,* 105 Cal.Rptr.2d 407, 19 P.3d at 1168.

nance, is far from clear. Distinguishing a manuscript that merely provides "verbal guidance,"—in the sense that it can be read and retyped—from one that is filmed or photocopied, on the grounds that in the latter cases the tangible manuscript is physically useful in the manufacturing process, *see Preston,* 105 Cal.Rptr.2d 407, 19 P.3d at 1158, is both conceptually tenuous and discriminatory for reasons that have little, if any, justification in tax policy. Accepted normative principles requiring functionally equivalent transactions to be taxed similarly, *see generally* 2 Jerome R. Hellerstein & Walter Hellerstein, *State Taxation,* ¶ 12.08[3] (3d ed.2002), would be thwarted by the disparate treatment of technologies, like photocopying and scanning, that serve similar purposes. And to the extent that scanning a manuscript could be treated as rendering it physically useful, too, it is not readily apparent why the manuscript would not similarly be physically useful as a medium for communicating the author's words to a typist for retyping. Seductive as the single-factor, physical usefulness test may be, it is an extremely blunt tool for implementing a legislative intent to tax only tangible personal property, given the variety of situations to which it must be applied.

Whether couched in terms of the true object, dominant purpose, or essence of the transaction, or of the consequential or incidental nature of the transfer of tangible property, the rationales of most courts attempting to characterize inseparably mixed transactions acknowledge, either explicitly or implicitly, that they are not reducible to a single, dispositive factor. *See, e.g., New England Telephone & Telegraph Co. v. Clark,* 624 A.2d 298, 302 (R.I.1993) ("The real-object test must be applied to the totality of the transaction."); *Mr. B's, Inc. v. City of Chicago,* 302 Ill.App.3d 930, 236 Ill.Dec. 127, 706 N.E.2d 1001, 1005 (1998) ("When tangible goods or items are provided in conjunction with services, courts examine the totality of the transaction to determine its taxability.") (internal quotation omitted); *Bullock,* 549 S.W.2d at 169 (because resolution of consequential or inconsequential inquiry can turn on many factors, issue must be decided on case by case basis). While

there has been no clear emergence of a comprehensive and consistent theory that more expressly articulates the goals of the analysis, a veritable plethora of factors have been relied on under the circumstances of individual cases.

Some courts have compared the value of the tangible property with that of the intangible property or service. *See, e.g., Washington Times–Herald v. District of Columbia,* 213 F.2d 23, 24 (D.C.Cir.1954) (sale of one-time-use cartoon mats was sale of professional and personal services rather than of mats because their value when blank was inconsequential compared with their value after the artwork was complete); *Fingerhut Prods. Co. v. Comm'r of Revenue,* 258 N.W.2d 606, 609 (Minn.1977) (value of mailing lists in tangible format was slight compared to price paid for names themselves). Other decisions have considered whether there was an alternative method of transfer. *See, e.g., Commerce Union Bank v. Tidwell,* 538 S.W.2d 405, 408 (Tenn.1976) (no taxable transfer where computer programming information conveyed by magnetic tape could have been transmitted by telephone lines or fed directly into the computer); *Bullock,* 549 S.W.2d at 168 (same). The length of time the information provided retains its value has also been considered significant. *See, e.g., Fingerhut,* 258 N.W.2d at 609 (mailing lists containing names of potential buyers had limited useful life expectancy); *Williams & Lee Scouting Service, Inc. v. Calvert,* 452 S.W.2d 789, 792 (Tex.App.1970) (statistical data provided to oil companies had very short useful life unless reported at least weekly). Some decisions have looked for constraints on the buyer's ability to use the tangible property. *See, e.g., Dun & Bradstreet v. City of New York,* 276 N.Y. 198, 204–05, 11 N.E.2d 728, 731 (1937) (significant that subscriber of confidential information was not allowed to share it with public); *Fingerhut,* 258 N.W.2d at 609 (significant that provider of mailing lists allowed them to be used only once, between set dates). Yet others have examined what is actually done with the tangible property after it has yielded the intangible component. *See, e.g., Commerce Union Bank,* 538

S.W.2d at 408 (sale of computer software not tangible personal property where once information was transferred into computer, tangible property was returned or destroyed); *Sneary v. Director of Revenue,* 865 S.W.2d 342, 346 (Mo.1993) (architectural illustrations were consequential because buyer did not dispose of illustrations after using them). Finally, several jurisdictions have considered whether the tangible property represents the finished product sought by the buyer. *See, e.g., Columbus Coated Fabrics Div. v. Porterfield,* 30 Ohio St.2d 307, 285 N.E.2d 50, 53 (1972) (finding that end product of the service, rather than service itself, that taxpayer was after); *Hasbro Indus., Inc.,* 487 A.2d at 126–27 (taxpayer's real object was mechanical artwork as an end product from which its product packaging could be fabricated in finished form for ultimate sale).

In circumstances not unlike those at issue here, the Missouri Supreme Court emphasized that the skill and expertise used to create a color separated film and color keys were the true objects of a sale and that a color separation served only as a medium to convey the transparency colors and had no value after having done so. *K & A Litho Process, Inc. v. Director of Revenue,* 653 S.W.2d 195 (Mo.1983) (where taxpayer received film transparencies and by highly technical and scientific process created color separation and key for making printing plates). It also distinguished the taxpayer's separated film from motion pictures, the latter being finished products which a buyer could use in the form sold. *Id.* at 197. In a later case, the same court distinguished transactions involving architectural illustrations, finding them not merely disposable conduits, where the architectural information was not transferred from them and they were not disposed of, and where the architect's clients desired, used, and valued the illustrations in the same form as sold, making them more like finished motion pictures. *Sneary v. Director of Revenue,* 865 S.W.2d 342 (Mo.1993).

Varied as these analyses may be, they largely share in common some attempt to identify characteristics of the transaction at issue that make it either more analogous to what is reasonably and commonly understood to be a sale of goods, or more analogous to what is generally understood to be the purchase of a service or intangible right. Perhaps the quintessential transaction for the purchase of an intangible right is the marketing of literary works, in which the clear object, around which the entire transaction is structured, is the right to publish the author's work. Although the transactions by Leanin' Tree may superficially appear to be akin to the purchase of artwork, which is normally considered to be the sale of a tangible object, upon closer examination the transactions between Leanin' Tree and its artists have much more in common with a transaction for the right to publish.

■ Unlike the typical purchase of a work of art, the transactions structured by Leanin' Tree do not include the transfer of title and possession with a right to resell or exhibit the artwork. In fact, they do not entitle Leanin' Tree to the enjoyment or profit from the finished product of the artist at all. Instead they grant it a right to use the image created by the artist in creating a new tangible object, which may be subject to sales and use tax. Consistent with this objective, the artist is not paid a lump-sum for his artwork or even for the use of his artwork as a lease agreement. Rather, he is compensated for his contribution to the production of the finished product, in the form of royalties or entitlement to a percentage of the ultimate sales. Despite having provided his artwork to Leanin' Tree for its use, the artist receives no compensation unless his image is ultimately incorporated into and sold as a new product. In all essential respects, the transactions structured by Leanin' Tree resemble the purchase of a right to edit and publish rather than the sale of artwork.

■ Unless the attempt to distinguish tangible from other-than-tangible property is abandoned altogether, some multi-factor or totality of circumstances test, permitting characterization of the transaction according to a reasonable and common understanding of those concepts, is virtually unavoidable. *See generally* 2 Hellerstein, *supra* at ¶ 12.08[2]. The necessary flexibility of such

an analysis will inevitably leave the characterization of some transactions in doubt. It is a longstanding rule of construction in this jurisdiction that tax statutes "will not be extended beyond the clear import of the language used, nor will their operation be extended by analogy.... All doubts will be construed against the government and in favor of the taxpayer." *Transponder Corp. v. Property Tax Admin.*, 681 P.2d 499, 504 (Colo.1984). To the extent that any doubt remains that the transactions by Leanin' Tree should be characterized as other than the purchase of tangible personal property, that doubt is therefore resolved in favor of Leanin' Tree.

### IV.

Considered in their totality, the challenged transactions, for which Leanin' Tree was assessed use tax, do not constitute transactions for the sale or use of tangible personal property within the contemplation of Boulder's tax code. Without considering the merits of the court of appeals' rationale, we therefore affirm its judgment affirming the district court.

Chief Justice MULLARKEY concurs in part and dissents in part, and Justice MARTINEZ and Justice BENDER join in the concurrence and dissent.

Chief Justice MULLARKEY, concurring in part and dissenting in part:

I agree with the majority that we should apply a multi-factor or totality-of-the-circumstances test to determine whether the transaction involved here is the sale or use of tangible personal property under the Boulder ordinance. I also agree that in applying the test, we should apply a practical, common sense understanding to determine the nature of the transaction. This is the approach advocated by 2 Jerome R. Hellerstein & Walter Hellerstein, *State Taxation*, ¶ 12.08[2] (3d ed.2002). As the authors point out, courts will have to untangle transactions that have both tangible and intangible qualities as long as legislative bodies continue to make artificial distinctions between tangible property that is taxed and services that are not taxed. *Id.*

However, I disagree with the majority's application of the test. Leanin' Tree purchases finished paintings from freelance artists. These are tangible, touchable objects that Boulder can tax under its ordinance. I respectfully concur in part and dissent in part from the majority opinion.

The *State Taxation* treatise cited above makes it clear that most states distinguish between written works which are not taxed, and photographs and artwork which are taxed. *Id.* The reason for the distinction is simple enough. Unless the writing involves a rare manuscript or something similar, the form of the writing has no significance. A publisher is purchasing the contents of the writing, that is, the purchaser buys the abstract ideas expressed in the writing.

A piece of visual art is treated quite differently. The purchaser buys a photograph or an artwork as a physical object that embodies the artist's ideas. The form is the substance of the work.

Although we have no relevant cases in Colorado, the regulations construing the state sales and use tax are helpful by analogy. Under these regulations, the services of photographers and photofinishers are taxable where the primary purpose of the transaction is the resulting physical photograph. 1 C.C.R. 201–5, Special Regulations, SR–34 "Photofinishers"; 1 C.C.R. 201–5, Special Regulations, SR–34.5 "Photographers". The regulation concerning photofinishers specifically states that "[p]hotofinishers are engaged in the business of selling tangible personal property to their customers and such sales are taxable." 1 C.C.R. 201–5, Special Regulations, SR–34 "Photofinishers". Under the regulation governing photographers, their services are likewise taxable unless the services are specifically bargained for and the tangible personal property is irrelevant in the transaction. 1 C.C.R. 201–5, Special Regulations, SR–34.5 "Photographers".

With respect to transactions for the use of photography and art in a commercial setting, many states treat the transaction as a sale of taxable tangible personal property rather than a sale of nontaxable services. *Preston*

*v. State Bd. Of Equalization,* 25 Cal.4th 197, 105 Cal.Rptr.2d 407, 19 P.3d 1148 (2001); *State Taxation,* at ¶ 13.05[2] (citing *Federated Dep't Stores v. Kosydar,* 45 Ohio St.2d 1, 340 N.E.2d 840 (1976); *Southern Bell Tel. & Tel. Co. v. Dep't of Revenue,* 366 So.2d 30 (Fla.Dist.Ct.App.1978); *Hillman Periodicals, Inc. v. Gerosa,* 285 A.D. 441, 137 N.Y.S.2d 863 (1955); *Voss v. Gray,* 70 N.D. 727, 298 N.W. 1 (1941)).

Helpful in understanding the taxation distinction between written works and visual arts is the California Supreme Court's decision in *Preston* which found the taxation of an artist's work permissible in circumstances very similar to the case at hand. In *Preston,* an artist appealed taxes assessed against her, arguing that her agreements with publishers and a manufacturer for the right to reproduce her artwork were not taxable under a state regulation that exempted taxation on intangible personal property. *Preston v. State Bd. Of Equalization,* 105 Cal.Rptr.2d 407, 19 P.3d at 1153–54. This regulation gave the publishing of a manuscript as an example for when the exemption would apply. *Id.* The artist specifically argued that an exemption would be proper in her case because, although the right to reproduce the artwork had been transferred, the artwork remained with her and thus no sale of artwork had occurred. *Id.* Pursuant to these agreements, the artist would transfer her finished pieces to the respective clients who would copy and reproduce the pieces and use the images in their finished products as illustrations in books or on rubber stamps. The artwork would then be returned to the artist, who would receive royalties on sales of the products. *Id.* at 1153.

In rejecting the artist's contentions, the California court distinguished artwork from a manuscript, explaining that tangible artwork was physically useful and necessary to the production process while a manuscript simply provided verbal guidance and was not essential to the manufacturing process. *Id.* at 1158. Although focusing on physical usefulness, essentially, the court found artwork distinguishable from written work because of the greater physical value of artwork to a purchaser that is not present in a manuscript.

Keeping in mind this distinction between a writing and an artwork, I now turn to the circumstances of this case. As stipulated by both parties, Leanin' Tree manufactures and sells greeting cards and other gift products that contain images of original artwork produced independently by artists. Pursuant to license agreements, Leanin' Tree is given the exclusive right to reproduce that artwork and "may incorporate such reductions, enlargements or modifications to individual original Artworks as Leanin' Tree, in its business judgment, may determine." In compensation, the artists are paid a royalty dependent on the volume of sales of the products displaying their artwork. In order to incorporate the artwork into its products, Leanin' Tree must physically obtain the artwork in order to create a color separation necessary to reproduce the artwork on the greeting cards and other products.

Under the facts presented in this case, it is clear that the purpose of the transactions in question was the use of the artists' actual tangible personal property. Similar to the case in *Preston,* Leanin' Tree's possession and use of the physical artwork in the manufacturing of its products was a key element in its transactions and necessary for the creation of its products. Although the transactions engaged in by Leanin' Tree are not typical transactions for the purchase of artwork, the fact that Leanin' Tree returns the artwork to the artists and pays them royalties contingent on the sales of items bearing their artwork has no significance. The transaction that Boulder seeks to tax is the same regardless of the purpose or nature of the transfer of the artwork and regardless of the form of payment agreed upon. *Id.* at 1158.

In my view, the Colorado regulations and the *Preston* decision provide a practical, common sense result that is consistent with the test adopted by the majority. Therefore, I would hold that payments made by Leanin' Tree, Inc. to artists for the right to reproduce their finished, original works of art on greeting cards and related products are sub-

ject to the City of Boulder's sales and use tax on tangible, personal property.

I am authorized to say that Justice MARTINEZ and Justice BENDER join in this concurrence and dissent.