**HERCULES INCORPORATED,**
**Relator (C2–97–574),**

**Hercules Credit, Inc., Relator**
**(C6–97–576),**

v.

**COMMISSIONER OF REVENUE,**
**Respondent.**

**Nos. C2–97–574, C6–97–576.**

Supreme Court of Minnesota.

March 12, 1998.

---

Alan E. Bernick, Oppenheimer Wolff & Donnelly, St. Paul, Paul H. Frankel, Hollis, L. Hyans, Michael A. Pearl, Morrison & Foerster, New York City, for relator.

Hubert H. Humphrey III, Atty. Gen., Barry R. Greller, Jeffrey G. Vigil, Asst. Attys. Gen., for respondent.

Jerome A. Geis, Briggs and Morgan, P.A., St. Paul, David A. Lawrence, Minneapolis, for amicus curiae Northern States Power Co.

## OPINION

BLATZ, Chief Justice.

This case requires us to examine the boundary between business and nonbusiness income for the purpose of determining a nondomiciliary corporation's income tax. In 1987, relator Hercules, Inc., a Delaware corporation that conducts business in Minnesota, sold its stock in Himont, Inc., a corporation that Hercules had helped to create four years earlier.[1] The sale resulted in a net capital gain of over $1.3 billion, and Hercules reported this gain as nonapportionable income on its 1987 Minnesota corporate tax return. The Minnesota Commissioner of Revenue issued a Notice of Assessment to

---

1. Hercules Credit, Inc. is also a party to this proceeding. Its income was included in Hercules' combined tax return for 1987. The Commissioner's apportionment of the Himont gain to Minnesota resulted in assessment to Hercules Credit of an additional $1,300. For simplicity, this opinion refers only to Hercules, Inc., but our decision applies to Hercules Credit as well.

Hercules in April 1991 seeking payment of an additional $1,270,803.24 in taxes for 1987. Hercules appealed, and in June 1994, the Commissioner issued a Notice of Determination on Appeal that assessed Hercules $1,513,107.41 in additional taxes and interest for 1987 based on its apportionment of the Himont gain to Minnesota. After a trial in May 1996, the tax court concluded that the Himont gain was business income apportionable to Minnesota because Hercules held the stock as a means of furthering its trade or business within the meaning of Minn.Stat. § 290.17, subd. 6 (1996). The tax court also concluded that apportionment of the Himont gain did not violate the Due Process Clause of the Minnesota or United States Constitutions, or the Commerce Clause of the United States Constitution. Because we conclude that the Himont gain is nonbusiness income and therefore is not apportionable to Minnesota, we reverse.

Hercules manufactures and markets a wide range of natural and synthetic products. Before 1983, Hercules manufactured polypropylene resin, a synthetic substance used in making appliance parts, automobile components, fibers, and housewares. In 1983, Hercules and Montedison S.p.A., an unrelated Italian company that was a leading international producer of polypropylene resin, created a new corporation, Himont. To create Himont, Hercules and Montedison each transferred their entire polypropylene resin manufacturing and sales businesses to it. Himont is a Delaware corporation and its principal place of business is in Wilmington, Delaware.

Upon forming Himont, Hercules and Montedison agreed that each company would initially own 50% of Himont's shares. Himont's Heads of Agreement stated that for the first five years of Himont's existence, Hercules and Montedison would each appoint three members to Himont's board of directors. In addition, for the first five years, Hercules would select and could dismiss Himont's president so long as Himont's board approved. For the same period, Hercules would also appoint the chair of Himont's board and Montedison would select the vice-chair. Less senior Himont officer positions would be filled equally by former Hercules and Montedison employees.

Hercules contributed to Himont all of its technology as well as tangible and intangible assets from its polypropylene manufacturing business. Because Hercules' contribution to Himont amounted to $180 million more than that of Montedison, Hercules and Montedison made various financial arrangements to equalize the value of their contributions in order to maintain each company's 50% ownership interest in Himont. These arrangements included a $70 million note from Himont to Hercules that was executed in 1983. Hercules established the interest rate at one percent above the London Interbank Offered Rate (LIBOR) or one-half percent above the prime rate, an arm's length market rate.

Hercules and Montedison formed Himont with the expectation that Himont would eventually make a public stock offering. On February 12, 1987, Himont offered 12.5 million shares of stock in its initial public offering (IPO). Consequently, Hercules' and Montedison's ownership share fell to 38.7% each. In an SEC disclosure document, independent auditors hired by the IPO underwriters concluded that all of the transactions between Hercules and Himont were not materially different from those that could be obtained by unrelated third parties.

Once Hercules spun off its polypropylene business to Himont, it continued to conduct business with Himont in two areas. First, Hercules purchased polypropylene resin from Himont at a negotiated discount, about two and one-half percent less than it charged other customers. Himont officials testified at trial that the company would have offered this level of discount to any other company that purchased a similar volume. Although the agreement between Himont and Hercules contemplated that Hercules would buy all of its polypropylene requirements from Himont, Hercules in fact purchased polypropylene from other suppliers as well. Even at the time of this appeal, Hercules continues to purchase polypropylene from Himont's successor under the same price structure.

Administrative services was the second area in which Hercules continued to conduct business with Himont. Hercules sold these

services to Himont, which included advertising, public relations, comptroller, engineering, law, information resources, medical, personnel, purchasing, safety, tax and audit, and treasury services.[2] The service contract's terms were negotiated, and Hercules' price bid matched quotes by other firms that provided similar out-sourcing services to corporations. The independent audit done in connection with Himont's IPO concluded that Hercules' fees for these administrative services were not materially different from those charged by unrelated companies.

In September 1987, Hercules sold all of its Himont stock to Montedison in response to Montedison's threat to mount a hostile takeover of Hercules. To ensure that Hercules would sell, Montedison paid a greater amount per share than the amount at which Himont stock was trading at that time. The sale resulted in a net capital gain to Hercules of $1,338,501,966. Hercules did not include the Himont gain as apportionable income on its 1987 corporate tax return but instead treated it as nonbusiness income to be allocated outside Minnesota.[3]

The Commissioner issued Hercules a Notice of Assessment in April 1991 that included an apportionment of the gain realized from the Himont stock sale. Hercules appealed. In June 1994, the Commissioner issued a Notice of Determination on Appeal that assessed Hercules $1,513,107.41 in additional taxes and interest for 1987.[4] The Commissioner concluded that "the relationship [between Hercules and Himont] was operational and unitary and as a result, the gain on the sale of the stock is properly included in the Minnesota income subject to apportionment." Hercules again appealed.

The Minnesota Tax Court held a three-day trial in May 1996 and issued its decision in January 1997 affirming the Commissioner's determination that the Himont gain was business income apportionable to Minnesota. On appeal to this court, Hercules contends that Minnesota tax statutes preclude including the Himont gain in income apportionable to Minnesota because the gain was nonbusiness income that should have been allocated outside Minnesota. Hercules also argues that including the Himont gain as apportionable income violates the Due Process Clause of both the Minnesota and United States Constitutions and the Commerce Clause of the United States Constitution.

I.

On appeal, we review the tax court's findings of fact to determine whether there was sufficient evidence to justify its decision. *F–D Oil Co., Inc. v. Commissioner of Revenue*, 560 N.W.2d 701, 704 (Minn.1997). Questions of law, including the interpretation of relevant statutes, are reviewed de novo. *Id.*

Minnesota's corporate tax statutes provide that a corporation's income derived from carrying on a trade or business must be apportioned between Minnesota and the other states in which the corporation does business. Minn.Stat. § 290.17, subd. 3. If, however, the income is not connected with the corporation's trade or business in Minnesota, it is not apportionable and is instead allocated to the corporation's domicile. *See id.,* subds. 2, 6. In determining whether income is apportionable to Minnesota, the dispositive issue is therefore whether the income is derived from carrying on the trade or business. We have minimal statutory guidance as to what it means for an intangible asset to be connected to a trade or business. The sole definition is set forth as follows: "intangible

---

**2.** In addition, Hercules and Himont also entered into an agreement that Himont would provide Hercules with services that included research and development. The record is unclear, however, as to whether the research and development agreement was in force at the time of Hercules' sale of Himont stock.

**3.** In 1987, Hercules' business activities in Minnesota were limited to one yeast manufacturing plant located in Hutchinson and approximately $23 million in sales to Minnesota customers.

Hercules reported its income for 1987 from manufacturing and sales apportionable to Minnesota as $20,051,965.

**4.** To reach its assessment, the Commissioner apportioned Hercules' income, including the capital gain from the Himont stock, using an apportionment percentage of 0.7510%. This increased Hercules' taxable income apportioned to Minnesota from $176,751 to $10,720,875.

property is employed in a trade or business if the owner of the property holds it *as a means of furthering the trade or business." Id.,* subd. 6 (emphasis added).[5] If the intangible is not held as a means of furthering the trade or business, it is nonbusiness income and thus is not apportionable. *See id.*

Although we have not interpreted this provision before, we have interpreted virtually identical language in an earlier version of the statute. The earlier version provided for apportionment of a corporation's entire net income derived from such trade or business, including income from intangible property *employed in such business. See* Minn.Stat. § 290.17(4) (1965) (emphasis added). In *Great Lakes Pipe Line Co. v. Commissioner of Taxation,* the Commissioner sought to tax gains from the short-term investment of excess working capital of a non-Minnesota corporation that transported petroleum products by pipeline. 272 Minn. 403, 405, 138 N.W.2d 612, 614–15 (1965), *appeal dismissed,* 384 U.S. 718, 86 S.Ct. 1886, 16 L.Ed.2d 881 (1966). Great Lakes Pipe Line placed its excess funds in short-term government bonds and prime commercial paper and reported them as current assets. *Id.* at 405–06, 138 N.W.2d 612, 614–15. We concluded that because the securities generated profit that the corporation used to pay expenses, the securities were employed in the business and thus the gain was apportionable to Minnesota. *Id.* at 412–13, 138 N.W.2d 612, 619.

Likewise, in *Montgomery Ward & Co. v. Commissioner of Taxation,* the corporation invested assets that were earmarked for future expansion of the retailing business in short-term securities. 276 Minn. 479, 480, 151 N.W.2d 294, 295 (1967). As in *Great Lakes Pipe Line,* Montgomery Ward carried the securities income as a current asset and used at least part of the income to pay operating expenses. *Id.* at 483, 151 N.W.2d 294, 296. In dicta, we recognized the possibility that at some point funds accumulated, held, and invested in anticipation of business expansion may have only a minimal relationship to the successful day-to-day operation of a general merchandising business. *Id.*

Our decisions in *Great Lakes Pipe Line* and *Montgomery Ward* provide a discernable boundary between business and nonbusiness income. A crucial issue in both decisions was the corporations' purchase of short-term securities with operating funds and integration of securities income into their respective petroleum pipeline and retailing operations. In both instances, on the record before the court, investment of excess assets in intangibles was an integral part of the corporations' day-to-day financial operations. *See Great Lakes,* 272 Minn. at 405, 412, 138 N.W.2d at 614–15, 619, *Montgomery Ward,* 276 Minn. at 483, 151 N.W.2d at 296–97. In contrast, Hercules' ownership and sale of Himont stock was not sufficiently linked to its day-to-day operations to make the Himont gain business income. Hercules carried the Himont stock on its books for more than four years as an investment, not as an asset. Moreover, it sold its Himont holdings only in direct response to Montedison's hostile takeover threat. We see no indication that Hercules wanted or needed the proceeds from the Himont gain to provide operating funds.[6]

5. We note briefly that the current statutory definitions of business income and our interpretation of earlier statutory language is consistent with the definition of business income that was previously set forth in the Uniform Division of Income for Tax Purposes Act (UDITPA): "income arising from transactions and activity in the regular course of the taxpayer's trade or business and includ[ing] income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." Minn.Stat. § 290.171, Art. IV, 1(a) (repealed 1987). Although UDITPA Article IV, which contained this definition of business income, was repealed in 1987, nothing in the legis- lative history suggests that the legislature sought to expand the definition of business income by repealing Article IV. *See Firstar Corp. v. Commissioner of Revenue,* 575 N.W.2d. 835, 838 (Minn. 1998).

6. The tax court noted that Hercules' 1987 Annual Report stated that the gain from the Himont stock sale allowed Hercules to "bolster [its] growth plans for Aerospace, Specialty Chemicals, and Engineered Polymers." This assertion, however, does not indicate that Hercules used the gain to meet operational expenses. Indeed, this language suggests that Hercules sought to put a positive spin on a transaction that we know from the record Hercules did not seek or want.

These facts sufficiently distinguish the Himont stock from the securities at issue in *Great Lakes Pipe Line* and *Montgomery Ward.* The record leads us to conclude that neither Hercules' holding of the Himont stock nor the gain realized from its sale was used in Hercules' day-to-day business operations. Therefore, we hold that the Himont gain is nonbusiness income and thus is not apportionable to Minnesota.

## II.

 Even if we had determined that the Himont gain fell within the statutory definition of business income, apportionment of that gain to Minnesota would violate the Due Process Clause of the United States Constitution. When a state seeks to tax a nondomiciliary corporation's multistate income, the Due Process Clause requires that there must be a minimal connection between the taxing state and the taxpayer's interstate activities, and a rational relationship between the taxing state and the intrastate value of the corporate business. *Allied–Signal, Inc. v. Director, Division of Taxation,* 504 U.S. 768, 772, 112 S.Ct. 2251, 2255, 119 L.Ed.2d 533 (1992). In the case of income from an intangible asset, these two requirements are satisfied by showing either that the taxpayer and the corporation that was the source of the income have a unitary business relationship, or that the intangible asset served "an operational rather than an investment function." *Id.* at 787, 112 S.Ct. at 2263.

The United States Supreme Court has stated that a unitary business relationship requires a "flow of value," that is, "some sharing or exchange of value not capable of precise identification or measurement—beyond the mere flow of funds arising out of a passive investment or a distinct business operation." *Container Corp. of America v. Franchise Tax Bd.,* 463 U.S. 159, 166, 103 S.Ct. 2933, 2941, 77 L.Ed.2d 545 (1983). In 1992, the Court reaffirmed its three-prong test for finding a unitary business relationship: functional integration, centralization of management, and economies of scale. *Allied–Signal,* 504 U.S. at 783, 112 S.Ct. at 2261. In addition, previous opinions by both the United States Supreme Court and this

court have identified factual situations that indicate the presence of a unitary business relationship. These situations include loans from the parent corporation to the subsidiary, advice and consultation, and the parent corporation's control over management of the subsidiary. *See, e.g., Container Corp.,* 463 U.S. at 173, 180 n. 19, 103 S.Ct. at 2944, 2948 n. 19; *ASARCO, Inc. v. Idaho State Tax Comm'n,* 458 U.S. 307, 320–24, 102 S.Ct. 3103, 3111–3113 (1982); *Allied–Signal,* 504 U.S. at 789, 112 S.Ct. at 2264; *Watlow Winona, Inc. v. Commissioner of Revenue,* 495 N.W.2d 427, 432 (Minn.1993).

Applying the law set forth in these cases, we see scant evidence of a unitary business relationship between Hercules and Himont. While it is true that Himont executed a note to Hercules in 1983 for $70 million, the note existed only to equalize the amount of capital Hercules and Montedison put into Himont. Moreover, it was at a variable, commercially competitive interest rate. Hercules did not otherwise loan money to or guarantee loans for Himont. Similarly, Hercules provided a broad spectrum of administrative services to Himont, including personnel, facilities, equipment systems, and equipment management, but these services were comparable to those available from many firms that provided corporate out-sourcing services. Importantly, Hercules provided these services at arm's length prices, and Himont continued to purchase them even after Hercules had sold its interest in Himont. The arm's length nature of these transactions indicates that they did not embody the requisite flow of value to create a unitary business relationship. Finally, Hercules could not exert sole control over Himont's management because it had to share control with Montedison. Hercules never owned more than 50% of Himont's stock, it was never able to appoint more than half of Himont's board or managers, and it could not appoint or dismiss the president without the board's approval. None of these situations create a unitary business relationship.

Further, there is no indication that Hercules' ownership of the Himont stock served an operational rather than an investment function. *See Allied–Signal,* 504 U.S. at 787, 112

S.Ct. at 2263. *Allied–Signal* stated that an assessment of whether an intangible asset served an operational function must focus "on the objective characteristics of the asset's use and its relation to the taxpayer and its activities in the taxing state." *Id.* at 785, at 2262. The Court gave two examples of how an intangible might serve an operational function: a short-term investment analogous to a bank account or certificate of deposit, or, under its decision in *Corn Products Refining Co. v. Commissioner,* a long-term investment in commodity futures that ensures a certain supply of a necessary product at a fixed price. *See id.* at 789–90, at 2264–65 (citations omitted), *Container Corp.,* 463 U.S. at 180 n. 19, 103 S.Ct. at 2948 n. 19.

As we discussed above, however, there is no evidence that Hercules treated its investment in Himont as a repository for working capital like a bank account or certificate of deposit. Nor did Hercules hold its Himont stock as a hedge against a fluctuating supply of polypropylene. The original Supply Agreement between Hercules and Himont, signed in 1983, stated that Hercules would buy all of its polypropylene from Himont. From that, we could arguably infer that Hercules initially sought to ensure a steady supply. The reality of Hercules' business practices, however, belies this inference. Polypropylene was widely available on the world market during the 1980s, and Hercules purchased it from suppliers other than Himont soon after the agreement was signed. Further, Hercules purchased polypropylene from Himont at an arm's length price, and continued to buy polypropylene from Himont at the same price even after it sold the stock. Any argument that Himont sold polypropylene to Hercules at a uniquely favorable price, solely based on its link to Hercules, is inconsistent with the record before us.

We hold that Hercules' capital gain from the sale of its Himont stock is nonbusiness income and thus is not apportionable to Minnesota. We also conclude that even if we had not deemed Hercules' gain from the sale of its Himont stock to be nonbusiness income, apportionment of the Himont gain to Minnesota would violate the Due Process Clause of the United States Constitution.

Reversed.

GILBERT, J., took no part in the consideration or decision of this matter.