**AMOCO CORPORATION and Affiliates, Respondents, Relators,**

v.

**COMMISSIONER OF REVENUE, Relator, Respondent.**

Nos. C1–02–680, C3–02–681.

Supreme Court of Minnesota.

April 3, 2003.

Thomas R. Muck, Fredrikson & Byron, P.A., Minneapolis, for Relators/Cross–Respondents.

Mike Hatch, Attorney General, State of Minnesota, Bradford S. Delapena, James W. Neher, Assistant Attorneys General, St. Paul, for Respondent/Cross–Relator.

## OPINION

ANDERSON, Paul H., Justice.

Relators, Amoco Corporation and eight of its fully owned subsidiaries, challenge the Commissioner of Revenue's computation of their corporate franchise taxes for the audit period from 1986 through 1990. During the audit period, relators filed Minnesota corporate franchise tax returns on a separate entity basis and paid aggregate corporate franchise taxes in the amount of $5,132,340. After conducting an audit of relators' returns, the Commissioner concluded that Amoco Corporation was a unitary business engaged in exploration, production, refining, and marketing; the entire income of the unitary business was therefore apportionable to Minnesota. Relators protested through an administrative appeal.

In a separate proceeding, one of the relators, Amoco Oil Company (AOC), filed amended corporate franchise tax returns, claiming a net refund for the years 1986–1990. During this time period, AOC paid Minnesota corporate franchise taxes in the amount of $3,768,533 and as a distributor of gasoline paid Minnesota gasoline excise taxes in the amount of $215,015,749. AOC asserted that its revenue from gasoline sales was not subject to the corporate franchise tax because the gasoline excise tax is in lieu of the corporate franchise tax. The Commissioner denied the refund

claims and AOC protested through an administrative appeal.

The Commissioner consolidated the protests and concluded that Amoco Corporation existed as a unitary business and that AOC was not entitled to a refund. The Commissioner issued a notice of determination on appeal stating that relators owed an additional $23,629,300.38 in taxes and interest. Relators appealed. In an order granting summary judgment in favor of the Commissioner, the Minnesota Tax Court concluded that the gasoline excise tax is not in lieu of the corporate franchise tax. The unitary business issue went to trial, after which the court concluded that Amoco Corporation's exploration and production were not part of a unitary business with its refining, marketing, and transportation operations. The court then ordered the Commissioner to compute relators' tax, excluding all exploration and production income. We affirm both rulings.

*Amoco Corporation and its Subsidiaries*

Amoco Corporation is an Indiana corporation with its principal place of business in Illinois. It fully owns over 175 subsidiaries. Amoco Corporation and its subsidiaries operate a large integrated petroleum and chemical enterprise and conduct business throughout the world. Amoco Corporation defines itself as "a parent corporation concerned with overall policy guidance, financing, coordination of operations, staff services, performance evaluation, and planning for its subsidiaries." Operations are conducted through three principal, wholly-owned subsidiaries: Amoco Production Company (APC), Amoco Oil Company (AOC), and Amoco Chemical Company (ACC). APC and AOC are each stand-alone corporations with their own subsidiaries and operate independently from Amoco Corporation on a daily basis.

AOC is a Maryland corporation with its principal place of business in Illinois. It engages in the refining, marketing, and transportation of petroleum and related products. Specifically, AOC purchases crude oil, refines it into useful products such as gasoline, home heating fuel, and jet fuel, and then markets the refined products. The products are sold to a variety of users including AOC's own service stations, third-party service stations, or third-party fuel oil distributors. AOC's own stations sell retail and wholesale gasoline and other petroleum products. During the audit period, AOC did not operate a refinery in Minnesota, but it did market refined petroleum products here. AOC's marketing operations in Minnesota primarily consisted of storing refined products in terminals and selling those products to its own service stations and to third-party service stations and fuel oil distributors.

APC explores for and finds crude oil and gas reserves around the world and brings them to the surface. After locating an oil reserve and bringing the crude oil to the surface, APC engages in the production of the crude oil, which requires treatment to separate impurities. The crude oil then passes thorough a Lease Automatic Custody Transfer Unit, also known in the industry as the "wellhead." At the wellhead, the volume of oil that is moved to the market is measured and is "the basis on which the producer [is] paid for the crude oil that the company produced." APC sells the crude oil at the wellhead to refiners or brokers. A competitive pricing mechanism controls the prices of crude oil, and buyers place bids on the crude oil by posting competitive field prices. During the audit period, APC did not conduct any exploration or production activities in Minnesota, nor did it have any property, payroll, or sales in Minnesota. APC is not a party in this appeal.

a. Relationship between AOC and APC

APC and AOC made their operating decisions independently from one another. APC did not consider AOC's needs when deciding where to explore or how much crude oil to produce. It produced all the crude oil it was legally allowed to produce. AOC used the same bidding process and paid the same prices as other third parties when it purchased crude oil from APC. An employee of Amoco Corporation, the vice president of crude oil supply, set the field price used by AOC to bid on APC's crude oil. The price was set at a competitive market rate even though it was in APC's best interest for the price to be high and AOC's best interest for the price to be low.

AOC purchased both proprietary and nonproprietary crude oil. Proprietary crude oil is oil in which APC has an ownership interest and nonproprietary crude oil is crude oil that another company owns when it is being produced. AOC made decisions about whether to purchase proprietary or nonproprietary crude oil based on its operational needs and without regard to the production capabilities of APC. Throughout the audit period, the percentage of proprietary crude oil produced in the United States and then refined in Amoco Corporation refineries was about 15 percent while about 24 percent was from proprietary crude oil produced worldwide.

Despite the day-to-day independence of APC and AOC, Amoco Corporation retained some centralized management control over the subsidiaries. For example, Amoco Corporation offered subsidiaries, for a fee, services such as payroll, corporate insurance, legal counsel, and lobbying. The Commissioner asserts that in 1998, APC purchased about 227 million dollars worth of these services provided by Amoco Corporation.

b. Purchasing

Examination of Amoco Corporation's different operational areas sheds light on the extent of centralized management. We turn first to purchasing. APC and AOC each operated its own purchasing department and APC and AOC each made its own "decisions around how they ran them and how they staffed them." No single purchasing plan applied to all of the subsidiaries. However, the general manager of purchasing for Amoco Corporation reviewed the operations of the subsidiaries' purchasing departments with the goal of enhancing the subsidiaries' operations. Moreover, Amoco Corporation implemented a general policy for the subsidiaries to follow. The policy was directed at procuring goods and services at the most effective price and minimizing excess supplies. In their independent operations, the subsidiaries followed this policy and thereby accessed the capabilities of Amoco Corporation to improve cost effectiveness. Amoco Corporation's purchasing department also developed "master contracts" to assist the individual subsidiaries in purchasing their goods and supplies.

c. Personnel Policy

Amoco Corporation's human resources department also maintained a level of control over the subsidiaries. Each subsidiary maintained its own human resources department and staff and functioned independently of Amoco Corporation's human resources department. Nevertheless, the vice president of Human Resources for Amoco Corporation oversaw the human resources departments of the subsidiaries.

The employee compensation system illustrates how Amoco Corporation's human resources department interacted with its subsidiaries. Amoco Corporation's human resources department established employee compensation policies for the top 350

employees of Amoco Corporation and its subsidiaries. However, management of each individual subsidiary recommended policies for lower level employees based on that subsidiary's specific market.

Amoco Corporation also oversaw the subsidiaries' human resources departments by implementing a human resources corporate policy. The Amoco Personnel Policy Manuel codified "[p]olicies governing the various aspects of employee-employer relations in all domestic operations of Amoco Corporation and its subsidiaries." The manual set out broad policy, to be administered by each subsidiary in areas such as employee behavior, pay classifications, smoking, office environment, occupational health, and safety.

### d. Budget and Financing

We next turn to the area of budget and financing. Amoco Corporation maintained some control over the financing and budget policies of the subsidiaries. For example, Amoco Corporation created one "consolidated control budget." The budget was based on a single forecast of corporate performance for the year and encompassed the three major operating subsidiaries. Amoco Corporation also maintained some control over the financing and debt of its subsidiaries. As a general policy, subsidiaries did not borrow money on their own and major items of long-term debt were issued in the name of Amoco Corporation, not in the name of the subsidiaries. When the subsidiaries borrowed money independently, Amoco Corporation usually guaranteed their debt. Amoco Corporation also financed the subsidiaries and funded subsidiaries that needed money from internal sources. Excess working capital from the subsidiary companies was regularly transferred to Amoco Corporation.

*Commissioner's Audit*

Between 1986 and 1990, relators established a tax nexus to Minnesota by conducting some business within the state. During the audit period, relators filed Minnesota corporate franchise tax returns on a separate entity basis. The Commissioner audited relators' returns for the 1986 and 1987 tax years and on November 29, 1993, issued notices of change in tax for those years. As part of the basis for the notices of change in tax, the Commissioner determined that Amoco Corporation and its subsidiaries existed as a unitary business. Relators protested the notices of change through administrative appeal.

The Commissioner then audited relators' returns for the 1988, 1989, and 1990 tax years and on August 12, 1996, issued notices of change in tax for those years. The Commissioner again found that Amoco Corporation existed as a unitary business. Relators timely protested the August 12, 1996, notices of change through administrative appeal. On January 6, 1997, the Commissioner began a full unitary audit of relators' business.

In a separate matter, one of the relators, AOC, filed amended corporate franchise tax returns claiming a net refund for the audit period. AOC based its refund claims on the argument that revenue from its sales of gasoline was not subject to the corporate franchise tax because AOC was subject to the gasoline excise tax. AOC claimed it was entitled to a net refund of $1,360,915. The Commissioner denied the refund claims in a Notice of Change in Tax dated December 21, 1998. On February 17, 1999, AOC protested the refund denial through an administrative appeal.

*Administrative Appeal*

The Commissioner consolidated AOC's protest with relators' two protests and issued a single notice of determination on appeal, concluding that relators owed an

additional $23,629,300.38 in taxes and interest for the audit period. As part of its determination, the Commissioner found a unitary relationship existed between Amoco Corporation's production and exploration operations and its refining, marketing, and transportation operations.

*Tax Court Proceedings*

In January 2000, relators filed notices of appeal with the tax court. Relators did not dispute that they are part of a unitary business; however, they argued that APC's petroleum exploration and production operations were not part of a unitary business with the refining, marketing, and transportation operations. In its notice of appeal, AOC also maintained that because it is subject to the gasoline excise tax, income earned from the sale of gasoline is not subject to the corporate franchise tax.

a. Gasoline Excise Tax

In July 2001, the parties filed cross-motions for partial summary judgment. AOC asserted that under the in lieu provision of the gasoline excise tax statute, it was exempted from paying the corporate franchise tax. *See* Minn.Stat. § 296.20 (1990). The statute provides, "[g]asoline excise taxes shall be in lieu of all other taxes imposed upon the business of selling or dealing in gasoline." *Id.* In response, the Commissioner argued that the in lieu provision of the statute applies only to taxes specifically imposed upon the gasoline industry; therefore, AOC is subject to both the gasoline excise tax and the corporate franchise tax because the corporate franchise tax is not imposed upon the gasoline industry in particular. The tax court issued an order denying AOC's motion for summary judgment and granted the Commissioner's motion for summary judgment. The court found that the in lieu provision applies only to taxes imposed specifically on the gasoline industry. Thus, the court concluded that the corporate franchise tax is not in lieu of the gasoline excise tax.

b. Unitary Business

At a trial in September 2001, relators and the Commissioner presented evidence pertaining to the unitary business issue. The Commissioner argued that the operations of APC and AOC were unitary and offered evidence to show centralization of management by Amoco Corporation over both of the subsidiaries. Relators argued that *Skelly Oil Co. v. Comm'r of Taxation,* 269 Minn. 351, 131 N.W.2d 632 (1964), controlled and required the tax court to conclude that APC and AOC are not in a unitary relationship. In response, the Commissioner argued that the law has changed since *Skelly* and that the statutory definition of unitary business has evolved along with United States Supreme Court cases. The court concluded that APC and AOC were "not of mutual benefit, dependent upon, or contributory to each other" and therefore did not constitute a unitary business.

c. Issues on Appeal

Relators filed a petition for writ of certiorari with this court to review the tax court's order of partial summary judgment. The Commissioner filed a petition for writ of certiorari to review the unitary business decision of the court. We consolidated the cases and consider two distinct issues on appeal: (1) whether APC's exploration and production operations are unitary with AOC's refining, marketing, and transportation operations, and (2) whether the gasoline excise tax is in lieu of the corporate franchise tax.

I.

We first consider whether APC's exploration and production operations are unitary with AOC's refining, marketing,

and transportation operations. While review of the tax court's factual determinations is limited to whether there is reasonable evidence to sustain the findings, *Great Lakes Gas Transmission L.P. v. Comm'r of Revenue*, 638 N.W.2d 435, 438 (Minn. 2002) (citation omitted), we have plenary power with respect to questions of law. *Watlow Winona, Inc. v. Comm'r of Revenue*, 495 N.W.2d 427, 431 (Minn.1993) (citation omitted). Resolution of the issue before us here involves interpretation of statutory and case law; we review such questions de novo. *Am. Nat. Gen. Ins. Co. v. Solum*, 641 N.W.2d 891, 895 (Minn. 2002); *BFW Co. v. County of Ramsey*, 566 N.W.2d 702, 704 (Minn.1997).

▬▬ Taxation of interstate business activity is governed primarily by Minn. Stat. § 290.17, subd. 3 (2002). Income derived from business conducted wholly within Minnesota is assigned to this state, whereas income derived from business conducted wholly outside of Minnesota is assigned outside this state. *Id.* Income from multistate businesses, i.e., business conducted partly within Minnesota and partly without, is apportioned between Minnesota and the other states.[1] *Id.*

▬▬ In assessing the tax liability of a multistate business, Minnesota may not tax value earned outside its borders. *Comm'r of Revenue v. Assoc. Dry Goods, Inc.*, 347 N.W.2d 36, 38 (Minn.1984) (citing *ASARCO Inc. v. Idaho State Tax Comm'n*, 458 U.S. 307, 102 S.Ct. 3103, 73 L.Ed.2d 787 (1982)). However, recognizing that it is sometimes unclear what portion of a multistate business's income is earned within the state, Minnesota adopted the unitary business principal. *Id.* Under the unitary business principle

[i]f a trade or business conducted wholly within this state or partly within and partly without this state is part of a unitary business, the entire income of the unitary business is subject to apportionment pursuant to section 290.191.

Minn.Stat. § 290.17, subd. 4(a) (2002). Thus, when a business is "unitary," the apportionment formula is applied to the income of the entire business. *Assoc. Dry Goods*, 347 N.W.2d at 38.

In 1955 in *Western Auto*, we defined the term "unitary business": a business is unitary when "the operation of the business within the state [is] 'dependent upon or contributory to the operation of the business outside the state.'" *W. Auto Supply Co. v. Comm'r of Taxation*, 245 Minn. 346, 356, 71 N.W.2d 797, 804 (1955) (citation omitted). Further, we stressed that "[t]he test of whether a business is unitary is whether its various parts are interdependent and of mutual benefit so as to form one business unit rather than separate business entities." *Id.* at 357, 71 N.W.2d at 805.

In 1982, the legislature codified the unitary business principle and defined unitary business as

a number of business activities or operations which are of mutual benefit, dependent upon, or contributory to one another, individually or as a group.

Act of Jan. 15, 1982, ch. 2, art. 3, § 13, 1982 Minn. Laws 77, 95 (codified as amended at Minn.Stat. § 290.17, subd. 4(b) (1990)). The legislature also created a presumption of unity:

Unity shall be presumed whenever there is unity of ownership, operation, and use, evidenced by centralized manage-

---

1. When a business is carried on partly within and partly without Minnesota, an apportionment formula, as opposed to geographic accounting, is used to determine the amount of income that is subject to taxation in Minnesota. The formula consists of three factors: sales, property, and payroll. Minn.Stat. § 290.191, subd. 2 (2002).

ment or executive force, centralized purchasing, advertising, accounting, or other controlled interaction.

Act of Jan. 15, 1982, ch. 2, art. 3, § 13, 1982 Minn. Laws 77, 95 (codified as amended at Minn.Stat. § 290.17, subd. 4(c) (2002)). The statutory definition of unitary business was derived from the common law definition developed in *Western Auto. Assoc. Dry Goods*, 347 N.W.2d at 38. From the time of its codification through the audit period at issue in this case, the statutory definition of unitary business remained substantially unchanged.[2]

Addressing the issue of whether APC's exploration and production operations are unitary with AOC's refining and marketing operations, the tax court first considered whether a presumption of unity existed, as shown by unity of ownership, operation, and use. The court found that the evidence offered by the Commissioner to show centralized management failed to invoke the presumption of the statutory test for unity because Amoco Corporation's management departments did not exercise daily operational control over AOC or APC.

Further, the tax court stated that even if the presumption of unity had been triggered, relators overcame that presumption. Noting that the statutory test requires the business activities to be of "mutual benefit, dependent upon, or contributory to one another," the court concluded that there was no significant mutual benefit or codependency between APC

and AOC. Minn.Stat. § 290.17, subd. 4(b) (1990). The court based its conclusion on evidence that APC and AOC each made capital and operational decisions independently of each other. The court held that "[t]he two businesses were distinct and driven by worldwide supply and demand, not by each other's needs. Either business could exist on its own without significant change in operation or earning potential."

The tax court next addressed the *Skelly* decision and determined that it controlled the instant case. The court first noted that the facts of *Skelly* are similar to the present case. The court also concluded that the definition of unitary business we used in *Skelly* is consistent with the statutory definition of unitary business. Reasoning that the legislature defined unitary business using a common law standard that existed when *Skelly* was decided, the court rejected the Commissioner's argument that the unitary business definition adopted by the legislature extended to the constitutional limits of taxation. Thus, the court reversed the order of the Commissioner with respect to the unitary business issue and ordered the Commissioner to recompute relators' tax, excluding all exploration and production income.

On appeal, the Commissioner argues that *Skelly* has been superseded by: (1) Minnesota's adoption of a statutory unitary standard; (2) the U.S. Supreme Court's modern analysis of unitary criteria; and (3) our use of the federal criteria in apply-

**2.** During the audit period, "unitary business" was defined as follows:

business activities or operations, which are of mutual benefit, dependent upon, or contributory to one another, individually or as a group. The term may be applied within a single legal entity or between multiple entities and without regard to whether each entity is a corporation, a partnership or a trust.

Minn.Stat. § 290.17, subd. 4(b) (1990). In 1999, the legislature amended the definition of unitary business to "activities or operations which result in a flow of value between them." Act of May 25, 1999, ch. 243, art. 2, § 22, 1999 Minn. Laws 2054, 2076 (codified at Minn.Stat. § 290.17, subd. 4(b) (2002)).

ing the Minnesota statute. In response, relators assert that *Skelly* controls the instant case because the legal test applied in *Skelly* is the same test as codified in Minn. Stat. § 290.17, subd. 4(b) (1990). We must therefore examine *Skelly* in detail to determine whether it is still relevant to our analysis.

The oil company in *Skelly* produced and sold crude oil and natural gas, refined crude oil, and marketed the refined products. *Skelly*, 269 Minn. at 352, 131 N.W.2d at 634. The company was organized into two discrete operating departments: (1) exploration and production, and (2) marketing and refining. During the audit period, 1951–1955, the exploration and production operations took place entirely outside of Minnesota. *Id.* However, the marketing and refining operations were conducted partly within and partly without Minnesota. The production department made decisions about exploration and production independently and without input from the manufacturing or marketing departments and without regard to the needs of the refineries. *Id.* at 353–54, 131 N.W.2d at 635.

Crude oil produced by Skelly was sold at the place of production, the wellhead. *Id.* at 354, 131 N.W.2d at 635. All sales of crude oil were made at competitive posted field prices. *Id.* at 355, 131 N.W.2d at 636. When purchasing crude oil from the production department, the marketing department paid the posted field price. *Id.* at 355–56, 131 N.W.2d at 636. The majority of Skelly crude oil was sold to third parties; only 7.49 to 9.32 percent of Skelly's crude oil was refined at Skelly's refineries. *Id.* at 362, 131 N.W.2d at 640.

During the audit period, Skelly filed Minnesota tax returns, including in the returns only income derived from its man-ufacturing and marketing operations. *Id.* at 358–59, 131 N.W.2d at 637–38. The Commissioner determined that Skelly owed additional taxes from its production income. Skelly appealed the decision to the Board of Tax Appeals.[3] The board found that "the taxpayer was engaged in two separate businesses, that of 'producing' and that of 'marketing.'" *Id.* at 362, 131 N.W.2d at 640. The board concluded that the business of producing was not dependent upon the business of marketing, the businesses could operate independently of each other, and that production income was earned entirely at the wellhead and not increased by the activities of man-ufacturing and marketing. *Id.* at 365, 131 N.W.2d at 641–42. However, the board concluded that the two businesses were "integrated" and that a percentage of production income should be allocated to Minnesota for tax purposes. *Id.* at 366, 131 N.W.2d at 642.

On appeal, we concluded that Skelly's production operations and marketing operations constituted separate independent businesses because Skelly's production operations were carried on wholly outside of Minnesota and its income earned at the wellhead. *Id.* at 370–71, 131 N.W.2d at 644–45. Applying the unitary business definition developed in *Western Auto*, we stated

> the board could scarcely have been thinking in terms of "mutual benefit," having found that Skelly's marketing was of no benefit to its production operations since all production income was "fully earned" at the point where the crude oil was available for sale or transfer at a posted field price. Neither could the board have been thinking in terms of dependency since it had found that production was "in no way dependent upon the business of marketing."

*Id.* at 370–71, 131 N.W.2d at 645.

---

**3.** The Board of Tax Appeals was the predeces-sor to the Minnesota Tax Court.

While the Commissioner correctly points out that *Skelly* was decided before the legislature codified the unitary business principle, this does not make *Skelly* irrelevant to the present case. We analyzed *Skelly* in the context of the unitary business definition developed in *Western Auto.* *Id.* (citing *Western Auto* and its definition of unitary business). In *Western Auto,* we defined unitary business using the terms "dependent upon," "contributory to," and "mutual benefit." *Western Auto,* 245 Minn. at 356, 71 N.W.2d at 804. The statutory definition of unitary business pertinent to this case reads as follows "business activities or operations which are of *mutual benefit, dependent upon,* or *contributory to* one another, individually or as a group." Minn.Stat. § 290.17, subd. 4(b) (1990) (emphasis added). The highlighted language above mirrors the language set forth in *Western Auto.* Therefore, *Skelly's* definition of unitary business is indistinguishable from the statutory definition effective during the audit period. Thus, although we decided *Skelly* under the common law definition of unitary business rather than the statutory definition, it is still relevant to the present case. We conclude that the tax court did not err by using *Skelly* to support its determination that APC's exploration and production operations are not unitary with AOC's refining and marketing operations.

As previously noted, the Commissioner also argues that *Skelly* is inapposite because it has been superseded by federal law. The Commissioner contends that we have equated the state and federal unitary business standards and in so doing, used evolving federal criteria when defining the state standard. Specifically, the Commissioner argues that we have judicially adopted federal criteria for ascertaining

when the unitary business standard has been satisfied and those criteria are functional integration, centralized management, economies of scale, loans, and loan guarantees.

The federal criteria the Commissioner points to were defined in *Container Corp. of Am. v. Franchise Tax Bd.,* 463 U.S. 159, 178, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983). The issue in *Container Corp.* was whether application of California's unitary business principle and apportionment formula to Container Corporation was permissible under the United States Constitution. *Id.* at 162–63, 103 S.Ct. 2933. In *Container Corp.,* the Court developed the "flow of value" definition of unitary business by stating that "[t]he prerequisite to a constitutionally acceptable finding of unitary business is a flow of *value.*" *Id.* at 178, 103 S.Ct. 2933. Additionally, the Court stated "a relevant question in the unitary business inquiry is whether 'contributions to income [of the subsidiaries] result[ed] from functional integration, centralization of management, and economies of scale.'" *Id.* at 179, 103 S.Ct. 2933 (citations omitted). Finally, the Court agreed with the state court that taken together the following factors indicate the existence of a unitary business: assistance in obtaining equipment and filling personnel needs, lending funds, guaranteeing loans, interplay in corporate expansion, technical assistance, and supervisory role in providing general guidance to the subsidiaries. *Id.* Based on these legal principles, which define the constitutional limits of the unitary business principle, the Court concluded that the state court's decision that Container Corporation was in a unitary relationship with its subsidiaries was constitutionally permissible. *Id.* at 180, 103 S.Ct. 2933.

In support of its position that we have relied on the federal criteria articulated in

*Container Corp.* when applying Minnesota's statutory unitary business principle, the Commissioner cites to three cases, decided after the 1982 codification of the unitary business standard: *Hercules Inc. v. Comm'r of Revenue,* 575 N.W.2d 111 (Minn.1998); *Caterpillar, Inc. v. Comm'r of Revenue,* 568 N.W.2d 695 (Minn.1997); *Watlow Winona, Inc. v. Comm'r of Revenue,* 495 N.W.2d 427 (Minn.1993). Relators respond by asserting that in these cases we were addressing the constitutional limits of unitary business, not analyzing unitary business under the statute; therefore, any reliance on federal law in these cases is irrelevant.

We first turn to *Hercules,* where the issue addressed was whether income from the sale of a business should be classified as nonbusiness or business income for purposes of determining a nondomiciliary corporation's income tax. *Hercules,* 575 N.W.2d at 114. The issue was not whether the business was unitary under the statute. We determined that the income at issue was nonbusiness income and therefore not apportionable to Minnesota. *Id.* at 116. We then concluded that even if the income qualified as business income, apportionment of that income to Minnesota would violate the Due Process Clause of the United States Constitution. *Id.* Considering the constitutionality of apportioning a nondomiciliary corporation's income from an intangible asset, we stated that due process is satisfied when either "the taxpayer and the corporation that was the source of the income have a unitary business relationship, or that the intangible asset served 'an operational rather than an investment function.'" *Id.* at 116 (quoting *Allied–Signal, Inc. v. Dir., Div. of Taxation,* 504 U.S. 768, 787, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992)). We then went on to espouse the constitutional rule developed in *Container Corp.* that a unitary relationship requires a "flow of value," and reiter-

ated the test for finding a unitary business relationship: "functional integration, centralization of management, and economies of scale." *Id.* Thus, in *Hercules* we addressed the unitary business principle in the context of due process and the constitutional limitations of that principle. We did not have occasion to consider the unitary business principle under the statutory definition found in Minn.Stat. § 290.17, subd. 4(b) (1990).

As in *Hercules,* the issue in *Caterpillar* was not whether the business was unitary. In *Caterpillar,* we addressed the issue of whether Minnesota's corporate excise tax system facially discriminated against foreign commerce. *Caterpillar,* 568 N.W.2d at 696. The parties stipulated to the facts, including the fact that Caterpillar operated as a unitary business. *Id.* In a footnote, we defined unitary business as "[c]orporations * * * related through common ownership, management, and/or functional integration so that a 'flow of value' and significant mutual interdependence exists between the corporations." *Id.* at 696 n. 1. In support of this definition, we cited to both Minn.Stat. § 290.17, subd. 4, and *Container Corp.* Nevertheless, this footnote is mere dicta because the parties had stipulated that the business was unitary.

Finally, we turn to *Watlow Winona.* The Commissioner contends that in *Watlow Winona* we "listed relevant unitary 'factors' from *Container Corp.,* then upheld a finding of unitariness under Minn. Stat. § 290.17, subd. 4(b)," relying on those very factors. The Commissioner misconstrues our reasoning in *Watlow Winona.* In *Watlow Winona,* the parties acknowledged facts necessary to establish a rebuttable presumption of unitariness and we therefore focused on whether Watlow Winona had rebutted the presumption. *Watlow Winona,* 495 N.W.2d at 431–32. When addressing *Container Corp.,* we said

that it "is the leading case discussing *the boundaries of unitary taxation.*" *Id.* at 432 (emphasis added). Thus, we discussed the federal criteria in the context of defining the constitutional parameters of the unitary business principle. We did not equate the constitutional limits of the unitary business principle with the statutory definition of unitary business. Further, *Watlow Winona* was decided under both the United States Constitution and Minnesota's income tax statute. *See Watlow Winona,* 495 N.W.2d at 428. Thus, as relators argue, for purposes of *Watlow Winona,* we did not separate the statutory unitary business issue from our analysis of the constitutional issue. Finally, although we did note that some of the same factors were present in *Watlow Winona* as in *Container Corp.,* contrary to the Commissioner's argument, this does not constitute judicial acceptance of federal criteria. We examined the *Container Corp.* factors and concluded that in the aggregate the factors supported the tax court's finding that the taxpayer failed to prove it was not engaged in a unitary business. *Id.* at 432. By addressing the issue in terms of the *Container Corp.* factors, we determined both whether the finding of unitariness was constitutional and whether the presumption had been rebutted in a single analysis.

After conducting a close examination of *Hercules, Caterpillar,* and *Watlow Winona,* we conclude that these cases demonstrate that we have not yet embraced the *Container Corp.* factors as part of Minnesota's statutory standard for unitary businesses. Thus, the next step in our analysis is consideration of whether we should use those factors in applying the statute. Because we cannot ascertain a valid reason to apply a standard different from that articulated by the legislature, we conclude that we should not use the *Container Corp.* factors.

Our legislature expressly adopted a common law standard when it enacted the statute applicable to this case. While the Supreme Court has established due process limits of the unitary business principle using a test that is arguably broader than the statutory definition applicable to this case, the legislature did not change the statute to reflect the constitutional standard until 1999, after the audit period in question here. Minn.Stat. § 290.17, subd. 4(b) (2002) (defining unitary business as "activities or operations which result in a flow of value between them"). Moreover, the statutory presumption of unity also illustrates that the legislature did not intend the unitary business statute to reach the constitutional limits of taxation. Under the statutory presumption, unity is presumed whenever there is "unity of ownership, operation, and use." Minn.Stat. § 290.17, subd. 4(c). Criteria such as: centralized management, purchasing, advertising, and accounting are evidence of a unity. *Id.* These criteria are derived from the Supreme Court's definition of unitary business. *Butler Bros. v. McColgan,* 315 U.S. 501, 508, 62 S.Ct. 701, 86 L.Ed. 991 (1942) (discussing unity of use, management, and ownership). However, these criteria are not the ultimate test. By proving the existence of these factors, the Commissioner only establishes a presumption of unity, indicating that the presumption can be overcome by a showing of the actual statutory factors that the businesses are "of mutual benefit, dependent upon or contributory to" one another. Therefore, the federal criteria articulated in *Container Corp.* are not applicable to our analysis; rather, we must interpret the statute's language as it is articulated in *Skelly.* Accordingly, we are to determine whether APC's exploration and production operations are "of mutual benefit, dependent upon, or contributory" to AOC's refining

and marketing operations. Minn.Stat. § 290.17, subd. 4(b) (1990).

■ Having established the proper definition for a unitary business, we now must determine whether the tax court properly found that APC's exploration and production operations were not engaged in a unitary business with AOC's refining, marketing, and transportation operations. A determination of unitariness is a mixed question of law and fact, but is "basically factual." *Watlow Winona*, 495 N.W.2d at 431 (citation omitted). We review the tax court's findings of fact to determine whether there is sufficient evidence to support the tax court's decision. *Id; see also Great Lakes Gas Transmission L.P.*, 638 N.W.2d at 438.

■ We conclude that there is sufficient evidence to support the tax court's conclusion that APC's exploration and production operations were not unitary with AOC's refining and marketing operations. As the court found, APC and AOC made their operational decisions independently. APC produced all of the crude oil it was legally permitted to produce and based its production on market demands, not on the needs of AOC. Similarly, AOC purchased crude oil based on its operational needs, not based on the production capabilities of APC. AOC also purchased the crude oil at the competitive posted field price. Moreover, on a day-to-day basis, APC and AOC operated independently from each other and Amoco Corporation.

We also conclude that the factors present in *Skelly*, on which the tax court relied to conclude that a unitary relationship did not exist, are also present here. In *Skelly*, the court based its conclusion that the business was not unitary on evidence that the income from the production operations was "fully earned" at the wellhead, where the crude oil was available for sale or transfer. *Skelly*, 269 Minn. at 370–71, 131

N.W.2d at 645. Moreover, the court also noted that the production operations were not dependent upon the marketing operations. *Id.* Here, APC earned its income at the wellhead, where it sold its crude oil at the posted field price to all buyers, including AOC. Also, APC's production was not dependent upon the refining and marketing operations. APC did not base the amount of crude oil it produced on AOC's refining needs and nationally sold around 85 percent of its crude oil to outside businesses. Therefore, we conclude that there is sufficient evidence to support the tax court's finding that APC's exploration and production operations are not in a unitary relationship with AOC's refining, marketing, and transportation operations. Accordingly, we hold that the tax court correctly determined that the Commissioner must compute relators' tax excluding all of APC's exploration and production income from the computation.

## II.

■ We next consider whether AOC, which is subject to the gasoline excise tax, is also subject to the corporate franchise tax. The issue presented, whether the "in lieu" provision of the gasoline excise tax exempts distributors of gasoline from the corporate franchise tax, is one of statutory construction. We review de novo the tax court's construction of the gasoline excise tax and the corporate franchise tax. *See A & H Vending Co. v. Comm'r of Revenue*, 608 N.W.2d 544, 546–47 (Minn.2000). "[T]he most basic rule of statutory construction" provides that when the language of a statute is clear and unambiguous, the plain meaning of the statute controls. *Green Giant Co. v. Comm'r of Revenue*, 534 N.W.2d 710, 712 (Minn.1995); Minn. Stat. § 645.16 (2002) (providing that courts shall not disregard the letter of the law

when a statute's language is clear and unambiguous).

The Minnesota legislature enacted the gasoline excise tax in 1925, one year after Minnesota citizens authorized such a tax by amending the constitution.[4] *See* Act of Apr. 21, 1925, ch. 297, 1925 Minn. Laws 369 (codified as amended at Minn.Stat. §§ 296.01–.421 (1990)). The gasoline excise tax was a "special tax" imposed upon the business of dealing in gasoline, with the purpose of raising revenue for maintenance and construction of the Trunk Highway System.[5] Op. Att'y Gen. No. 86A–34 (Apr. 24, 1924); Minn. Const. of 1857, art. IX § 5 (1924). The 1925 act imposed an excise tax of 2 cents per gallon "on all gasoline used in producing or generating power for propelling motor vehicles used on the public highways of this state." Act of Apr. 21, 1925, ch. 297, § 2, 1925 Minn. Laws 369, 370 (codified as amended at Minn.Stat. § 296.02, subd. 1 (1990)).[6] The act created a presumption that all gasoline produced or brought into the state is intended for use in motor vehicles. Act of Apr. 21, 1925, ch. 297, § 9, 1925 Minn. Laws 369, 372 (codified as amended at Minn.Stat. § 296.16, subd. 1 (1990)).[7] Therefore, the tax was payable by distributors of gasoline. *See Arneson v. W.H.*

*Barber Co.*, 210 Minn. 42, 47, 297 N.W. 335, 338 (1941). Finally, the legislature provided that the tax "shall be in lieu of all other taxes imposed upon the business of selling or dealing in gasoline, whether imposed by the state or by any of its political subdivisions, but shall be in addition to all ad valorem taxes now imposed by law." Act of Apr. 21, 1925, ch. 297, § 13, 1925 Minn. Laws, 369, 374 (codified as amended at Minn.Stat. § 296.20 (1990)).[8]

The corporate franchise tax was enacted in 1933. Act of Apr. 21, 1933, ch. 405, 1933 Minn. Laws 688. The act imposed a tax on the net income of corporations for "the privilege of existing as a corporation." Act of Apr. 21, 1933, ch. 405, § 2, 1933 Minn. Laws 688, 690 (codified as amended at Minn.Stat. § 290.02 (2002)). Revenue from this tax was to be paid into an "Income Tax School Fund" to be distributed to all the Minnesota school districts. Act of Apr. 21, 1933, ch. 405, § 57, 1933 Minn. Laws 688, 726. While the gasoline excise tax applied only to distributors of gasoline, the franchise tax applied to "every domestic and foreign corporation." Act of Apr. 21, 1933, ch. 405, § 2, 1933 Minn. Laws 688, 690. But the legislature did exempt certain corporations and organizations from the franchise tax.[9]

4. *See* Minn. Const. of 1857, art. IX § 5 (1924) (authorizing the state to levy an excise tax on either gasoline or "the business of dealing in selling or producing" gasoline, used to power motor vehicles, with proceeds of the tax to fund the Trunk Highway System).

5. The Trunk Highway System consisted of 70 public highways to be constructed, improved, and maintained by the state, and was created by a constitutional amendment in 1920. Minn. Const. of 1857, art. 16 (1920).

6. Minnesota Statutes § 296.02, subd. 1, was repealed in 1998 and recodified as Minn.Stat. § 296A.07, subd. 1 (2002). Act of March 18, 1998, ch. 299, § 31, 1998 Minn. Laws 308, 344.

7. Minnesota Statutes § 296.16, subd. 1, was repealed in 1998 and recodified as Minn.Stat. § 296A.18, subd. 1 (2002). Act of March 18, 1998, ch. 299, § 31, 1998 Minn. Laws 308, 344.

8. Minnesota Statutes § 296.20 was repealed in 1998 and recodified to Minn.Stat. § 296A.12 (2002). Act of March 18, 1998, ch. 299, § 31, 1998 Minn. Laws 309, 344.

9. The corporations and organizations originally exempted from the act include the following: national and state banks, corporations engaged in the business of mining or producing iron ore, insurance companies, fraternal beneficiary associations, co-operative, or mutual rural telephone associations, corpo-

In its summary judgment order, the tax court considered the plain language of the gasoline excise tax and concluded that the phrase "imposed upon the business of selling or dealing in gasoline" acted as a limitation on the words "all other taxes." Thus, the court concluded that the "in lieu" provision applies exclusively to taxes imposed upon the gasoline industry in particular. Next, the court determined that the corporate franchise tax, a tax imposed on the privilege of existing as a corporation, is not a tax imposed upon the business of selling or dealing in gasoline. Therefore, the court concluded that gasoline distributors are subject to the corporate franchise tax.

The tax court then concluded that even if the language of the statute were ambiguous, legislative history supports its conclusion. The court noted that the gasoline excise tax and the corporate franchise tax cover entirely separate subject matters. The gasoline excise tax was an additional tax imposed upon gasoline distributors for the privilege of distributing gasoline, whereas the corporate franchise tax was imposed upon corporations for the privilege of doing business in Minnesota. The court then noted that while the corporate franchise tax exempts certain corporations from the tax, it does not exempt distributors of gasoline. Lastly, the court explicitly rejected AOC's contention that the legislature chose not to exempt gasoline distributors from the corporate franchise tax because the gasoline excise tax already removed them from the corporate franchise tax.

AOC contends that the clear language of the gasoline excise tax supports its position that the in lieu provision encompasses all other taxes imposed upon distributors of gasoline. To support its position, AOC engages in a word-by-word analysis of the phrase "*in lieu of all other taxes imposed upon the business of selling or dealing in gasoline.*" (Emphasis added.) Crucial to AOC's analysis is its contention that the words "imposed upon" mean "payable by." Further, AOC argues that the legislature used the term "the business" to clarify that the gasoline excise tax is payable by a business, as a legal entity, rather than by a consumer of gasoline. AOC concludes that "the business" means "the payer of the gasoline tax," which means the distributors because they are the entity that pays the tax.

Under AOC's reasoning, the sentence at issue means *in lieu of all other taxes payable by distributors of gasoline.* We find AOC's reasoning unpersuasive. AOC ends its analysis at the word "business" and neglects to give meaning to the last part of the phrase "of selling or dealing in gasoline." The rules of statutory interpretation require courts to give effect to all of the statute's provisions. Minn.Stat. § 645.16 (2002). Adding the last part of the phrase to AOC's construction of the sentence creates the following phrase: *in lieu of all other taxes payable by distributors of gasoline selling or dealing in gasoline.*

In contrast to AOC's interpretation of the statute, the Commissioner adopts the reasoning of the tax court. The tax court concluded that the phrase "imposed upon the business of selling or dealing in gasoline," following the phrase "all other tax-

---

rations engaged in the business of lending money to home builders, labor, agricultural, and horticultural organizations, farmers, public charities, corporations organized for scientific, literary or artistic purposes, business leagues and commercial clubs, clubs orga-

nized and operated for pleasure, recreation or other nonprofitable purposes, any corporation owned by the United States or the state of Minnesota. Act of Apr. 21, 1933, ch. 405, § 5 1933 Minn. Laws 688, 691–92 (codified at Minn.Stat. § 290.05, subd. 1 (2002)).

es," illustrates that the legislature intended to limit the in lieu provision to taxes imposed specifically on the gasoline industry. The court found that any other reading would render part of the phrase superfluous. We agree.

If the legislature had intended the in lieu provision to apply to all taxes imposed upon gasoline distributors, the legislature could have ended the phrase at "all other taxes." The provision would read, *the gasoline excise tax shall be in lieu of all other taxes.* Ending the phrase at "all other taxes" would shelter distributors of gasoline from all other taxes. However, the legislature did not end the sentence at "all other taxes," and meaning must be given to the rest of the sentence. Under AOC's construction of the statute, the words "selling or dealing in gasoline" become superfluous. Thus, AOC's construction of the statute contravenes the rules of statutory construction.

Looking at the plain language of the statute, we conclude that the phrase "imposed upon the business of selling or dealing in gasoline" connotes a tax on the transaction of selling or dealing in gasoline. Therefore, we conclude that the phrase "imposed upon the business of selling or dealing in gasoline" indicates that the in lieu provision applies only to taxes imposed specifically on the transaction of selling or dealing gasoline.

The plain language of the corporate franchise tax also supports our conclusion. The corporate franchise tax was passed eight years after the gasoline excise tax. The corporate franchise tax expressly exempts specific corporations and organizations from the tax. Act of April 21, 1933, ch. 405, § 5, 1933 Minn. Laws 688, 691–92 (codified as amended at Minn.Stat. § 290.05, subd. 1 (2002)). Gasoline distributors are not one of the corporations or organizations originally exempted from the tax, nor were they specifically exempted from the corporate franchise tax in effect during the audit period at issue here. Minn.Stat. § 290.05, subd. 1 (2002).

Nevertheless, AOC argues that the absence of a specific exemption for gasoline distributors in the corporate franchise tax is irrelevant. First, AOC argues that if the legislature intended gasoline distributors to pay the franchise tax in addition to the gasoline excise tax, the legislature would have exempted the franchise tax from the in lieu provision of the gasoline tax. Second, AOC contends that when the legislature adopted the franchise tax, it was aware of the gasoline excise tax and saw that it was unnecessary to duplicate the exemption.

AOC's arguments here also fail. Under the rules of statutory interpretation, "[w]hen the provisions of two or more laws passed at different sessions of the legislature are irreconcilable, the law latest in date of final enactment shall prevail." Minn.Stat. § 645.26, subd. 4 (2002). Under AOC's interpretation of the in lieu provision, the provisions of the gasoline excise tax and the corporate franchise tax are irreconcilable. According to AOC, the gasoline excise tax includes the franchise tax within its in lieu provision, thereby sheltering distributors from paying the franchise tax. However, on its face, the franchise tax applies broadly to all corporations and does not exclude gasoline distributors from the tax. Applying the rules of statutory interpretation, the corporate franchise tax was enacted after the gasoline excise tax and its terms should prevail.

For the reasons stated above, we conclude that the gasoline excise tax is in lieu of all other taxes imposed specifically upon the transaction of selling or dealing in gasoline. The corporate franchise tax is not included in the in lieu provision because the franchise tax is imposed on all corporations doing business in Minnesota,

not on the gasoline industry in particular. Accordingly, we hold that the tax court properly concluded that AOC is subject to both the gasoline excise tax and the corporate franchise tax.

Affirmed.

GILBERT, J., took no part in the consideration or decision of this case.